Marvin CHERNER et al.

v.

TRANSITRON ELECTRONIC CORPORATION, et al.

Civ. A. No. 61-857-W.

United States District Court
D. Massachusetts.

June 17, 1963.

See also 221 F.Supp. 48.

James D. St. Clair, Boston, Mass., Louis Loss, Cambridge, Mass., Jacob Green, Boston, Mass., Marvin Cherner, Birmingham, Ala., for petitioners.

Milton Pollack, New York City, pro se.

George I. Mulhern, Jr., Boston, Mass., pro se.

Lawrence Milberg, New York City, pro se.

WYZANSKI, District Judge.

This case is before the Court in response to an order to show cause why application for counsel fees and disbursements and petitions for reimbursement to plaintiffs and intervenors should or should not be granted.

Applications of counsel included:

1. Jacob Green, Louis Loss, James D. St. Clair, and Marvin Cherner, attorneys for the class of Transitron stockholders, including plaintiffs, intervenors, and Financial Industrial Fund, Inc. for an allowance of $750,000, less a disbursements credit balance of $1,464.41.

2. Milton Pollack, attorney for Diversified Growth Stock Fund, Inc., One William Street Fund, Wellington Fund, Inc., and Wellington Equity Fund, Inc., for an allowance of $235,000 for disbursements of $1,233.95.

3. Lawrence Milberg, attorney for Jack Kassoff, for an allowance of $75,000 and for disbursements of $84.,

4. George I. Mulhern, Jr., attorney for Ina Schlesinger, et al., for an allowance of $3,000, and for disbursements of $89.31.

Petitioners for reimbursement included:

1. 25 plaintiffs and intervenors in the Cherner suit, $2,190.35.

2. Financial Industrial Fund, Inc., $7,987.99.

3. Diversified Growth Stock Fund, Inc., $5,335.05; Wellington Fund, Inc. and Wellington Equity Fund, Inc., $5,335.02; One William Street Fund, Inc., $5,335.04.

As background for an understanding of those applications a brief summary of this litigation is necessary.

Transitron filed with the S.E.C. two registration statements which became effective, respectively, in December 1959 and November 1960, each in connection with a different offering of its stock. In each of these registration statements Transitron stated that it "holds no patent licenses from others requiring the payment of royalties and knows of no patent rights of others which might interfere with the conduct of its business." Each of these registration statements also contained statements (the basis of what were later called "accounting allegations") with respect to inventories. The registration statements made no reference to any peculiar sales or production

difficulties (if there were any) or to any price deterioration (if there was any) or any unusually severe competition (if there was any) affecting Transitron products.

As appears in Cherner et al. v. Transitron Electronic Corp., D.Mass., 201 F. Supp. 934, Cherner and others on November 8, 1961 sued Transitron and others in this Court in C.A. 61–857–W, 221 F. Supp. 48. The complaint, as amended November 20, 1961 had 4 counts, 2 of which purported to be "spurious class actions" under F.R.Civ.P. Rule 23(a)(3). This amended complaint was directed at alleged material misstatements and material omissions with respect to patents, and was not directed at other possible misstatements or omissions.

March 30, 1962, Financial Industrial Fund, Inc. (hereafter called F.I.F.) filed against the same defendants a complaint in C.A. 62–247 setting forth the same alleged material misstatements and omissions exclusively with respect to patents.

After much preliminary investigation of the so-called "accounting allegations", on April 6, 9, and 10, 1962, respectively, (1) Diversified Growth Stock Fund, Inc., (2) Wellington Fund, Inc. and Wellington Equity Fund, Inc., and (3) One William Street Fund, Inc., filed in the Superior Court, New Castle County, State of Delaware, 3 separate complaints against Transitron Electronic Corporation, et al., alleging certain alleged misstatements and omissions in the Transitron registration statements with respect to valuation of inventory, price and production difficulties, price deterioration, and competitive problems of Transitron.

April 16, 1962 in this Court, F.I.F. amended its complaint to add substantially the same "accounting allegations" as those in the Delaware litigation. Cherner moved to amend his complaint in the same way, but this Court on April 30, 1962 denied the motion with leave to renew it after this Court had ruled on defendants' motion for summary judgment on the patent question.

August 6, 1962 this Court denied defendants' motion for summary judgment in the Cherner case. September 25, 1962 this Court denied in the F.I.F. action defendants' motion for partial summary judgment with respect to the count setting forth the accounting allegations included in the amendment of April 16, 1962.

October 19, 1962 this Court in the Cherner case ordered that all issues as to whether there were misstatements or omissions in the registration statements with respect to the patent question be severed for separate trial.

During the summer and fall of 1962 there were informal settlement discussions involving the 2 Massachusetts and the 3 Delaware cases. All counsel who had appeared in the 5 cases negotiated an overall proposed settlement and brought their proposal to this Court, in chambers, on December 8, 1962. On December 26, 1962 this Court entered a conditional judgment with respect to the proposed settlement, and on the same day issued an order "to show cause directed to all persons who prior to February 21, 1962 had purchased shares of Transitron to show cause why the Agreement of Compromise and Settlement should not be approved and the conditional judgment entered by the Court made final." January 23, 1963 this Court held a hearing on its show cause order. January 24, 1963 this Court filed an opinion indicating that if certain amendments were made in the proposed settlement the Court would give its approval to the settlement. January 28, 1963 this Court filed a further memorandum with respect to the proposed settlement. The parties having amended the proposed settlement to conform to this Court's opinion and memorandum, this Court entered on February 1, 1963 a final judgment approving the amended Agreement of Compromise and Settlement. The time for appeal from that judgment expired. Thereafter, the individual defendants Bakalar, pursuant to the judgment, paid into Court United States obligations having a value of $5,300,000. And the applications and petitions now before the Court were filed in purported compliance

with paragraphs 3(a) and 3(c) of the amended Agreement, which provide:

"(a) To reimburse the plaintiffs and intervenors in the lawsuits listed in paragraph 1 above for fees and expenses heretofore actually paid by them to the undersigned counsel."

"(c) To pay, to the extent approved by the Court, the fees and disbursements of counsel of record heretofore appearing for plaintiffs and intervenors in the above entitled action and of counsel for plaintiffs in the other actions listed in paragraph 1 above. Plaintiffs and intervenors in said actions may urge all applicable grounds which support their claims for such fees and expenses. No party to this agreement shall object to or appeal from any allowance of such compensation on the ground that as a matter of law such compensation may not be based on the amount of the entire fund in Court. No fees or disbursements of counsel for defendants shall be paid out of the fund."

It will be convenient first to consider together the first two applications listed earlier in this opinion: (1) that of Messrs. Green, Loss, St. Clair, and Cherner (usually called hereafter the Green group) and (2) that of Mr. Pollack. Messrs. Green, Loss, St. Clair and Cherner all were counsel for all the plaintiffs, all the intervenors, and all the spurious class of Transitron stockholders in the Cherner case, D.Mass., C.A. 61–857–W, 221 F.Supp. 55 and the first three were counsel for the F.I.F. case, D.Mass., C.A. 62–247. Mr. Pollack was counsel for plaintiffs in the three Delaware state court actions, Nos. 398, 406, and 407.

■ ■ No question has been, or could validly be, raised as to the jurisdiction of this Court to entertain and adjudicate these applications. Trustees v. Greenough, 105 U.S. 527, 26 L.Ed. 1157 and Sprague v. Ticonic National Bank, 307 U.S. 161, 59 S.Ct. 777, 83 L.Ed. 1184. The Greenough cases recognized that when through one's efforts a fund is re-

covered in which others share, the Court which has jurisdiction of the fund may make allowances from that fund for "reasonable costs, counsel fees, charges and expenses incurred in the fair prosecution of the suit, and in reclaiming and rescuing the * * * fund." Trustees v. Greenough, 105 U.S. 527, 537. Such allowances are to be made as part of the court's authority to do equity in a particular situation. Sprague v. Ticonic National Bank, 307 U.S. 161, 59 S.Ct. 777, 83 L.Ed. 1184. And such an allowance may be made to one whose efforts helped produce the fund, although he did not profess to act or to sue representatively" or to proceed in "an avowed class suit." Ibid p. 167, 59 S.Ct. p. 780.

An applicant's claim for allowances under the Greenough doctrine is quasi-contractual in nature. Inasmuch as his claim sounds in contract, he is not subject to such limitations as may apply to a litigant who seeks a reasonable attorney's fee as part of his damages, and whose claim sounds in tort. See 15 U.S.C. § 15, Union Leader Corp. v. Newspapers of New England, et al., D.Mass., 218 F.Supp. 487. The standards to be applied to a quasi-contractual claim, analogous to the claim at bar, were recently stated in these words in Angoff v. Goldfine, 1st Cir., 270 F.2d 185, 188–189:

"* * * the district courts are to be governed by the standard of reasonableness with reference to the particular facts of each case. Nor is there any dispute that the following factors are to be carefully considered and weighed in fixing the amounts of compensation to be awarded in cases of this sort. These factors are: the amount recovered for the corporation; the time fairly required to be spent on the case; the skill required and employed on the case with reference to the intricacy, novelty and complexity of issues; the difficulty encountered in unearthing the facts and the skill and resourcefulness of opposing counsel; the prevailing rate of compensation for those with the skill, experience and

standing of the attorneys, account-ants or others involved; the contingent nature of the fees, with the accompanying risk of wasting hours of work, overhead and expenses (for it is clearly established that compensation is awarded only in the event of success); and the benefits accruing to the public from suits such as this."

As the Angoff case itself illustrates, a court may properly be reversed for allowing a claimant too small an allowance. But a court may also be reversed for allowing too large an amount. Central Railroad, etc. v. Pettus, 113 U.S. 116, 128, 5 S.Ct. 387, 28 L.Ed. 915; Milwaukee Towne Corp. v. Loew's Inc., 7th Cir., 190 F.2d 561, 569–570

Before applying the principles laid down in Angoff, it is important, particularly because of the rivalry between the Green group and the Pollack group, to emphasize that the fund from which allowances are to be paid in this particular case was produced by a settlement, not by a judgment based on a full trial.

The aspects which produced that settlement included (1) investigation before any pleadings were filed, (2) drafting of pleadings, (3) pre-trial discovery following the filing of complaints, (4) motions, particularly in Cherner motions for summary judgment in advance of a plenary trial, and (5) negotiations connected with the settlement. All of these aspects are to be taken into account, whether they were performed in an office or in a courtroom, by a lawyer or a layman, or required skills taught at a law school or bargaining talents best revealed in the market-place. But, although all these aspects are to be taken into account, all were not equally important in the instant case in inducing the defendant Bakalar brothers to pay into court $5,300,000.

My carefully considered conclusion is that what chiefly accounted for the Bakalar decision to pay $5,300,000 was a combination of two factors.

First, when this Court in the Cherner case on August 6, 1962 denied defendants'

motion for summary judgment on the patent aspects of the case, defendants realized that a jury trial was inevitable, that (because of the amounts involved and other non-rational as well as rational motives) an adverse jury verdict was likely, and that in all probability defendants would be forced to rely on their substantial chance of persuading an appellate court that whatever might have been omitted from the registration statements with respect to the patent matters was not as a matter of law a material omission. My opinion is that defendants correctly believed that they had a substantial chance of ultimately persuading an appellate court that any omission was not material. Yet they also correctly believed that the stakes were potentially so high that it was prudent to pay a fraction of the possible adverse judgments.

Second, after defendants were sued in the federal court here by F.I.F., and in the state courts in Delaware by four other investment trusts, they realized that, because of the relationship of the investment trusts to their beneficiaries, and because of the large resources of those trusts, there was a high probability that defendants would face long, expensive litigation involving the most detailed examination of their business records, their accounting procedures, and related matters, and that the investment trusts, once having begun litigation, would not readily abandon it. With respect to the accounting allegations, defendants correctly believed that predictions were more difficult than with respect to the patent issues, but they recognized that if they lost on those accounting issues potential recoveries were as great as on the patent issues, and a settlement at a fraction of the possible adverse judgments was desirable.

I find as a fact that the Bakalars would not have made a substantial settlement with the Green group alone, or with the Pollack group alone. The only course satisfactory to the Bakalars was to rid themselves of the risks of all 5 suits, and so far as possible the risk of any other

claim based upon the two registration statements.

Probably defendants regarded the possibility of their losing the patent issues was greater than the possibility of their losing the accounting issues. On the other hand, they realized that the cost of defending the accounting issues was many times as expensive as the cost of defending the patent issues, and involved far more serious problems of business morality which, if even litigated, tended to affect their reputation. The patent issue might be thought technical; the accounting issues in part involved attempts to cash discredit on defendants' general reliability.

Furthermore, defendants no doubt regarded, as this Court regards, the Green group as having one highly significant strategic advantage not possessed by the Pollack group. Only the Green group had brought a purported class action. Defendants reasonably may have doubted whether the class action would be upheld either at the trial or at the appellate level. Yet if the class actions were upheld, the potential liability of defendants was so vast as to defy calculation.

Nonetheless, it must not be assumed that the Pollack group's interest was limited to the amounts which the clients who retained them should recover in Delaware. If while the Cherner case was pending in the federal courts, and before the federal courts had adjudicated the accounting allegations, the Pollack group secured for its clients favorable judgment on the accounting issues in the Delaware state courts, then the Pollack group might be entitled to compensation for the services rendered not only to their own clients but also to any others for whom a fund became available through the efforts of the Pollack group. Sprague v. Ticonic National Bank, et al., 307 U.S. 161, 167, 59 S.Ct. 777, 83 L.Ed. 1184.

Recognizing the foregoing considerations, and not ignoring factors such as the relative extent of investigation, pleadings, discovery, and pre-trial development of issues in the 2 federal and 3 state cases, the actual time spent by counsel, the strictly legal skill displayed by counsel, their business acumen and resourcefulness, and the financial strength and other aspects of the bargaining position of the various parties, I find that the Green group was more than three times as important a producing cause of the settlement, and made more than three times as significant a contribution to the settlement, as did the Pollack interests.

Having so far as possible apportioned the relative causal impact of the Green and Pollack groups, I turn now to other factors, particularly in the light of the principles enunciated in Angoff.

The time spent by the Green group is shown in specific affidavits. James D. St. Clair, Esq., the senior trial counsel, an advocate of outstanding reputation, skill, and experience, spent 297.3 hours. Professor Louis Loss of the Harvard Law School, an expert of international reputation and acknowledged expertness in the field of securities regulation, spent 257 hours. Jacob Green, Esq., and Marvin Cherner, Esq., two younger members of the bar, spent respectively 1,451 and 77½ hours. Milton Pollack, Esq., (a lawyer whose performance in this Court fully supports the reputation he has earned on account of his skill, experience, and standing in New York, his home state) and his associates have not estimated the exact number of hours they spent on the Delaware cases and the settlement negotiations. But their sworn schedule of what they did justifies an inference of more than 500 hours of work.

The Green group and the Pollack group make extended contentions as to their investigations of facts, the complexity of the legal issues, and the benefits that have accrued to the public from suits such as this. These contentions are considerably inflated. The patent question emerged as a result less of the ingenuity of counsel in these cases than of publicity given to Western Electric Co.'s claim against Transitron in a quite independent proceeding. The accounting allegations were not explored to a point which would justify this Court, at least,

in saying that there had been unearthed facts demonstrating defendants' liability.

No doubt questions as to civil liability under the Securities Act, as to coverage of spurious class actions, and as to benefits available to members of such actions are intricate, novel, and complicated. The Green group was alert in raising *all* these questions, and the Pollack group was alert in raising questions as to civil liability under the Securities Act. They have added to the effectiveness of the *in terrorem* sanctions of the Securities Act. Insofar as fear of the impact of a regulatory statute is in the public interest, Messrs. Cherner, Green, Loss, St. Clair, and Pollack rendered a benefit to the public. But, having settled the case before trial, they have not been required to help a court to answer the intricate, novel, and complicated questions of law which lurked in the Cherner and other cases. Neither courts, nor practicing lawyers, nor academic authorities can with much success turn to this litigation for guidance on other than fringe procedural questions.

Were it not for the size of the fund recovered in this case, it is clear that the other factors would not justify allowances for the combined efforts of the Green and the Pollack groups of anything like so much as $100,000. Indeed, the $80,000 award made by this Court in In re Pomerantz, D.Mass., 186 F.Supp. 412 covered services which involved equally able counsel, equally difficult investigations and discoveries of fact, equally complicated issues of law, and the use of far more time of both senior and junior lawyers.

The Green applicants avowedly and the Pollack application impliedly seek compensation calculated almost exclusively upon a percentage basis. Thus the Green group memorandum suggests that for their compensation alone one approach would be to take a flat 15 percent of the basic amount of $5,000,000" or a "step down formula" related to what the Green group had agreed with F.I.F. would be counsel's compensation from F.I.F. in the event of a successful prosecution of

C.A. 62–247. The Pollack application alleges that their group's services should be appraised at $250,000.

Admittedly, there are courts which have allowed a high percentage of even a large fund as allowances to those whose efforts produced that fund. Law review articles written by persons who were not always pure scholars, or otherwise completely disinterested, have been cited as approving those allowances. Yet none of the cases allowing a high percentage of a large fund is from the Supreme Court of the United States or from the Court of Appeals of this circuit. None would be in accord with the prevailing customs of this Commonwealth. See Hayden v. Hayden, 326 Mass. 587, 596–597, 96 N.E. 2d 136.

No one expects a lawyer to give his services at bargain rates in a civil matter on behalf of a client who is not impecunious. No one expects a lawyer whose compensation is contingent upon his success to charge, when successful, as little as he would charge a client who in advance had agreed to pay for his services, regardless of success. Nor, particularly in complicated cases producing large recoveries, is it just to make a fee depend solely on the reasonable amount of time expended. Yet unless time spent and skill displayed be used as a constant check on applications for fees there is a grave danger that the bar and bench will be brought into disrepute, and that there will be prejudice to those whose substantive interests are at stake and who are unrepresented except by the very lawyers who are seeking compensation. Moreover, in the Cherner case, counsel are acting as fiduciaries not only for clients who chose them, but for persons who did not select them and who may have inadequate means effectively to object on their own behalf in this Court.

Admittedly, commercial considerations will always play some part in the practice of the law. But the nature of our calling as an "ancient and honorable profession" precludes judicial awards of counsel fees so high as to excite the warranted indignation of those whose money is used,—

or the understandable criticism of those who successfully perform equally complicated and publicly useful tasks at the bar,—or the justified outrage of the public if a court should use other people's money to make an award equal to what ordinarily is earned only over many years as compensation for services that took a short time to perform.

Taking into account all the factors stated in Angoff, this Court makes the following awards for reasonable and just compensation for contributions to the creation of the $5,300,000 fund in Court:

■ 1. To Messrs. Marvin Cherner, Jacob Green, Louis Loss, and James D. St. Clair $200,000 compensation is awarded. These counsel have called to this Court's attention that heretofore they have received retainers of $1,000 from Financial Industrial Fund, Inc., and of $200 from Axe Sciences Electronics Corporation, and from plaintiffs and intervenors in Cherner $1,990.35. Whether those sums must be returned by counsel to clients is a question on which I do not pass, inasmuch as it is not within my jurisdiction, and, in any event, I do not have before me all the facts with respect to the retainers. These counsel also disbursed $5,889.75. This sum they are also entitled to recover. This Court does not determine what proportion of that sum, if any, counsel are under an obligation to refund to clients who advanced money for disbursements.

■ 2. To Mr. Milton Pollack for himself and his associates $65,000 compensation is awarded. This Court does not determine whether any part of that sum must be repaid by Mr. Pollack to his clients who gave him retainers of $15,000. He is also entitled to his disbursements of $1,233.95.

In order to avoid any misapprehension, let me make it clear that even if the award to the Pollack group were reduced or eliminated, this Court, unless otherwise instructed by an appellate court, would not on account of such reduction or elimination increase above $200,000 the award to the Green group. This Court did *not* proceed by first determining that $265,000 should be allowed for the combined efforts of the two groups and then splitting it in a 200/65 proportion. On the contrary, this Court regarded $200,000 as the most that it was appropriate to award, even for a $5,300,000 recovery, for the 297$\frac{9}{10}$ hours spent by Mr. St. Clair, the 257 hours spent by Professor Loss, and the 1528$\frac{1}{2}$ hours spent by lawyers of junior status, especially where most of the time was spent in investigation, research, and drafting, with only a few appearances in court to argue motions and like matters, and with only a few days of intensive bargaining in connection with the settlement achieved. My sole reason for putting near the start of this opinion my findings as to the relative causal effect of the Green and Pollack efforts was to make it plain that the Green group could not rightly contend that defendants, in paying into Court $5,300,000, or in negotiating earlier or later versions of the Agreement of Compromise and Settlement, were concerned only with the federal court litigation. [See defendants' statement filed June 4, 1963 and herewith incorporated in the record of this case.].

This Court now turns to the three petitions before this Court. Each is from a client or clients of the Green or the Pollack group.

First I deal with the first two petitions for reimbursement of expenses, one in behalf of plaintiffs and intervenors in the Cherner case, C.A. 61–357–W, and the other on behalf of F.I.F. in C.A. 62–247. In considering the petitions, I stress the point that for *all* their contributions the Green group has just been allowed $200,000 together with disbursements of $5,889.75. This award was intended as a recognition of all the services rendered by the Green group, by their clients, and by their client F.I.F.'s counsel, Leland E. Modesitt, Esq., who has never appeared in this litigation, and who is unknown to me except by reference made in the petition or application filed May 1, 1963. These two petitions are denied *in toto*.

Second, I deal with the petitions of the three mutual funds involved in the Delaware state litigation. In considering these petitions, I stress the point that for *all* their contributions the Pollack group has just been allowed $65,000 together with disbursements of $1,233.95. That award was intended as a recognition of all the services of the Pollack group and their clients, except for disbursements not otherwise compensated as follows:

| | |
|---|---|
| Diversified Growth Stock Fund, Inc. | $335.05 |
| Wellington Fund, Inc. | $167.51 |
| Wellington Equity Fund, Inc. | $167.51 |
| One William Street Fund, Inc. | $335.04 |

The sums just listed are awarded to the petitioners just listed. Otherwise the petitions are denied.

Out of abundance of caution, this Court repeats that nothing in this opinion purports to decide whether the Green group or the Pollack group is under a legal obligation to return to its clients retainers received by it. All that this Court has decided is how much the fund in this Court owed for contributions of services by its creators; and this Court has identified those creators by groups. This Court does not purport to exercise jurisdiction to determine and, in any event, has inadequate facts to determine whether, for example, there are contracts dividing the award to the Green group so that a pre-determined share goes say to Mr. Green, or to Mr. Cherner, or to Mr. Loss, or to Mr. St. Clair; or whether the so-called retainers paid to the Green group or the Pollack group were intended to be in addition to what this Court, in applying the Greenough doctrine, determined to be just compensation. Moreover the appropriate payment out of a fund in response to a quasi-contractual claim arising out of the creation of that fund might or might not be an appropriate measure of what a client owed his counsel in response to a contractual claim relating to substantially the same services but based upon an express contract.

Two other applications require notice.

George I. Mulhern, Jr., Esq., on behalf of Palmer, Dodge, Gardner, and Bradford on July 13, 1962 filed in this Court a complaint in C.A. 62–503–W, Ina Schlesinger et al. v. Transitron Electronic Corporation. Paragraph 3 of Mr. Mulhern's affidavit admits that "Such complaint was based upon the same alleged untrue statements of material facts and alleged omissions of material facts as the alleged untrue statements and omissions described in the complaints in the Cherner case and the Financial Industrial Fund, Inc. case." On motion of Mr. St. Clair, Cherner's counsel, this Court on September 16, 1962 stayed C.A. 62–503–W until a final disposition of the Cherner case.

It does not appear to this Court that Mr. Mulhern or his clients had any effect upon the defendants' willingness to make a settlement or to pay any fund into this Court. Nor does it appear that Mr. Mulhern contributed any novel ideas, or did any significant work in either the Schlesinger case, or the Cherner case, or related cases. Indeed the "nature of work done" shown in the Mulhern affidavit is of the most routine, simple character. He claims a total time spent of 46½ hours and disbursements of $89.31. But inspection of the work done casts grave doubt on the need for all the time reported. In effect, all that Mr. Mulhern did he could have accomplished by filing in Cherner a petition for intervention. I allow George I. Mulhern, Jr., Esq. a fee of $100 and disbursements of $89.31.

Lawrence Milberg, Esq. and William I. Berger, Esq., counsel for Jack Kassof, an objecting stockholder, seeks an allowance on the ground that they persuaded this Court (1) to disapprove that feature of the originally proposed Agreement of Compromise and Settlement which provided for a payment of $300,000 to certain mutual funds, and (2) to make a condition of this Court's approval of the settlement an increase in the sum deposited by the Bakalars from $5,000,000 to $5,300,000.

Before this Court heard or knew of the objections of Messrs. Milberg and Berger

it had determined not to approve the settlement unless the $300,000 were added to the $5,000,000 instead of being paid to the mutual funds. Moreover, before Messrs. Milberg and Berger objected, this Court received from many Transitron stockholders written objections to the payment of $300,000 direct to the mutual funds. All those objections were on file in the Clerk's office. Mr. Milberg added nothing to them. The Milberg affidavit states that he expended 49¾ hours and made disbursements of $84. Mr. Milberg is not entitled to any compensation.

In view of the fact that no Transitron stockholder has yet received any payment from the fund, this Court will direct that payments of the allowances to attorneys shall be made one-half on December 30, 1963 and one-half on March 2, 1964, and that none of these allowances shall carry interest.