Kenneth J. YABLONSKI and Joseph A. Yablonski, Appellants,

v.

UNITED MINE WORKERS OF AMERICA et al.

Nos. 24560–24563.

United States Court of Appeals, District of Columbia Circuit.

Argued Sept. 16, 1971.

Decided Aug. 3, 1972.

Mr. John W. Douglas, Washington, D.
C., with whom Mr. Quin Denvir, El Cen-
tro, Cal., was on the brief, for appel-
lants.

Mr. Paul R. Connolly, Washington, D.
C., with whom Mr. Edward L. Carey,
Washington, D. C., was on the brief, for
appellees. Mr. Earl C. Dudley, Jr.,
Washington, D. C., also entered an ap-
pearance for appellees.

* Sitting by designation pursuant to 28 U.S.
C. § 294(d) (1964).

1. At oral argument we were informed that
Mr. Yablonski died intestate; and that,
on January 12, 1970, letters of adminis-
tration were issued to his two sons, Ken-
neth J. Yablonski and Joseph A. Ya-

Before McGOWAN and WILKEY,
Circuit Judges, and GOURLEY,* Senior
District Judge for the Western District
of Pennsylvania.

McGOWAN, Circuit Judge:

In the course of the bitterly contested
1969 election for the presidency of the
United Mine Workers of America, one of
the candidates, the late Joseph A. Ya-
blonski, instituted in the District Court
four separate lawsuits under the Labor-
Management Reporting and Disclosure
Act of 1959. 29 U.S.C. §§ 401ff. Mr.
Yablonski did not live to see those cases
through to final conclusion since he, to-
gether with his wife and daughter, was
murdered shortly after the election.[1]
Significant and substantial preliminary
relief was, however, forthcoming in, or
by reason of, those suits. In each case
eventual motions were made for the al-
lowance of attorney's fees to the plain-
tiff; and the consolidated appeals now
before us are from orders of the Dis-
trict Court denying those motions. We
reverse.

### I

The litigations giving rise to the ap-
peals before us are as follows:

*1. The Mailing List Case.*

Promptly after announcing his candi-
dacy, Mr. Yablonski invoked the provi-
sions of § 401(c) of LMRDA imposing a
duty upon a labor organization "to com-
ply with all reasonable requests of any
candidate to distribute by mail or other-
wise at the candidate's expense cam-
paign literature in aid of such person's
candidacy to all members in good stand-
ing of such labor organization
. . ." 29 U.S.C. § 481(c). Receiv-
ing no meaningful response from UMW
to his request, Yablonski sued in the

blonski. There is pending before us a mo-
tion to substitute the personal representa-
tives of Mr. Yablonski, and to amend
the caption of these appeals accordingly.
Rule 43(a), F.R.App.P. We grant the
motion and amend the caption to show
Kenneth J. Yablonski and Joseph A.
Yablonski as the appellants.

District Court to compel compliance with the statute. A preliminary injunction giving the relief sought was entered after a contested hearing. Appealed to this court, we denied a stay and the appeal was ultimately withdrawn. Three separate mailings were made during the course of the campaign, the first to each of the 162,000 UMW members informing them of Yablonski's candidacy and of his qualifications, and the other two to each local union, the second of which advised the locals of their responsibilities under LMRDA and the union constitution with respect to the conduct of a fair election.

## 2. The Reinstatement Case.

With the announcement of his candidacy, Mr. Yablonski was promptly removed, without notice and without any serious attempt at justification, from his job as Acting Director of Labor's Non-Partisan League in Washington and reassigned to District 5 in Pittsburgh which was controlled by his opponent, Mr. Boyle, the UMW presidential incumbent. Section 609 of LMRDA makes it unlawful for any labor organization "to fine, suspend, expel, or otherwise discipline any of its members for exercising any right to which he is entitled" under the Act. 29 U.S.C. § 529. Mr. Yablonski again filed suit, with the result that the District Court, after hearing, found as a fact that the removal had been motivated by a purpose to retaliate for his candidacy. A preliminary injunction was granted, ordering his reinstatement. The response of the defendants was grudging at best, and reinstatement was actually effected only after Mr. Yablonski threatened to seek a contempt order.

## 3. The Journal Case.

Alleging that the defendants were continuously using as a campaign tool against him the *UMW Journal*, a union publication sent regularly to every UMW member, Mr. Yablonski sued on behalf of himself and all UMW members to stop this practice. Section 401(c) of LMRDA bans discrimination by a labor

organization "in favor of or against any candidate with respect to the use of lists of members." 29 U.S.C. § 481(c). The District Court, finding that a *prima facie* case had been made that the defendants were violating this statute in their use of the *Journal*, issued a temporary restraining order (which we refused to stay), and thereafter, after hearing, a preliminary injunction which ordered the defendants (1) to stop the practice complained of and (2) to distribute a copy of the court's findings and injunctive order to each UMW member.

## 4. The Fair Election Case.

Mr. Yablonski's fourth resort to the courts was on behalf of himself and all UMW members, asking that, by reference to Sections 401(c) and (e) and 501 of LMRDA, 29 U.S.C. §§ 481(c), (e), 501, the defendants be ordered to promulgate and to effectuate rules and procedures designed to assure fairness in the election. This action was taken only after Mr. Yablonski had formally requested the defendants to permit inspection of UMW membership lists and to issue to all locals rules for the conduct of the election. This request included specific proposals for inclusion in such rules. When these requests were denied, they were followed by a further request that the union leadership institute a suit for a declaration of the terms under which the election should be held. Receiving no response to this last request, Mr. Yablonski filed this suit.

The election call sent out after this litigation was commenced contained, for the first time in UMW history, two of the procedures suggested by Mr. Yablonski—secret balloting and candidate observers—but it went no further towards the promulgation of comprehensive election rules for the locals. When the matter came on for hearing on a preliminary injunction, the court was critical of the defendants, and this was countered by the making to the court of certain representations as to steps the defendants would take. These included undertakings that each local would be sent a

set of detailed rules for the election; UMW membership lists would be prepared and made available for inspection by all candidates; election results, by local, would be sent to each local; and 51,000 extra ballots held by the defendants would be returned to the printer. By reason of such representations, the District Court exercised its discretion to withhold preliminary relief. In that event, the actions taken constituted compliance with substantially all of the items enumerated in Mr. Yablonski's complaint as entitling him to judicial intervention.

## II

The election was held on December 9, 1969, and Mr. Yablonski's death occurred later that month.[2] On February 9, 1970, the motions for counsel fees were filed in each of the cases. An opposition was filed by the defendants, and they took the deposition of the lawyer who had represented Mr. Yablonski in the four suits. On June 22, 1970, the District Court, after hearing and argument, entered an order dismissing three of the cases as moot (the Mailing List,

Reinstatement, and *Journal* Cases), and denying the motions for fees in those cases. On July 2, 1970, a further order was entered in the Fair Election Case denying the motion for fees "insofar as the services claimed to have been rendered are related to the Section 401(c) . . . aspect of the case." This case had, in the preceding order, been consolidated by consent with a fifth pending Yablonski suit which alleged violations of fiduciary obligations under Section 501(a) of LMRDA, the text of which is set forth in the margin.[3]

In a memorandum opinion accompanying the first of its orders, the District Court characterized the result reached by it as reflecting allegiance to the principle that, where Congress provides a statutory scheme of rights and remedies enforceable in the District Court and does not at the same time expressly contemplate the allowance of counsel fees, such fees are not to be supplied through an exercise of the inherent powers of the court. It noted that Congress had explicitly provided for counsel fees in two sections of LMRDA (201(c) and 501(b));[4] and it thought that this cir-

---

2. At the time of his death Mr. Yablonski had acted formally to protest the manner in which the election had been conducted. The District Court on May 1, 1972, in an action instituted by the Secretary of Labor under LMRDA, voided the election and directed that a new one be held. Among the matters relied upon by the District Court in reaching this result were the actions by appellees involved in the *Journal* and Reinstatement Cases.

3. "The officers, agents, shop stewards, and other representatives of a labor organization occupy positions of trust in relation to such organization and its members as a group. It is, therefore, the duty of each such person, taking into account the special problems and functions of a labor organization, to hold its money and property solely for the benefit of the organization and its members and to manage, invest, and expend the same in accordance with its constitution and bylaws and any resolutions of the governing bodies adopted thereunder, to refrain from dealing with such organization as an adverse party or in behalf of an adverse party in any matter connected with his

duties and from holding or acquiring any for any profit received by him in whatever capacity in connection with transactions conducted by him or under his direction on behalf of the organization. A general exculpatory provision in the constitution and bylaws of such a labor organization or a general exculpatory resolution of a governing body purporting to relieve any such person of liability for breach of the duties declared by this section shall be void as against public policy." 29 U.S.C. § 501(a).

pecuniary or personal interest which conflicts with the interests of such organization, and to account to the organization

4. Section 201(c), in providing a right for union members to inspect union records where necessary to verify the annual financial report called for by LMRDA, authorizes the court in its discretion to allow a reasonable attorney's fee as an incident to any relief granted in such an action. 29 U.S.C. § 431(c). Section 501(b) contemplates that, when a union organization refuses upon request to take action under Section 501(a) to recover union money or property which has been

cumstance, taken together with the relevant legislative history, exhibited a Congressional purpose to withhold fee allowances in respect of rights asserted under other parts of the Act. To the extent that it might be asserted that Congress should not be taken as having clearly and positively foreclosed an assertion of judicial power to award fees where a litigant has conferred benefits on persons other than himself, the court was of the view that the suits were brought "for the primary purpose of aiding Yablonski in his election bid," and it professed to be "not satisfied" that the suits "were intended to or did benefit the union except in the most indirect and theoretical way." Thus, said the court, there could be no "basis" for an allowance of attorney's fees by virtue of its general equity powers.

### III

Our difference with the District Court does not derive from disagreement with its conclusion that Congress has made no express provision for the award of counsel fees in respect of the particular statutory causes of action pursued by Mr. Yablonski in his four law suits.[5] We think, however, that judicial inquiry does not stop there. The relevant questions left to be answered are (1) whether Congress is to be taken as having manifested a purpose to preclude the allowance of such fees, and (2) if it has not, whether, in the circumstances disclosed by this record, it is appropriate for the court to grant such relief independent of explicit statutory authorization.

■ With respect to the first of these issues, the District Court relied upon both the legislative record relating to LMRDA and a decision of the Supreme Court involving an entirely different statute. Fleischmann Distilling Corp. v. Maier Brewing Co., 386 U.S. 714, 87 S.Ct. 1404, 18 L.Ed.2d 475 (1967). We find each of these to be very slender supports for the conclusion rested upon them. On the legislative side, the evidence adduced consists of a comment contained in a dissenting statement to a House Committee Report,[6] and

misappropriated, a union member may, with prior leave of the court, bring suit for this purpose; and the trial judge "may allot a reasonable part of the recovery in any action under this subsection to pay the fees of counsel prosecuting the suit at the instance of the member of the labor organization and to compensate such member for any expense necessarily paid or incurred by him in connection with the litigation." 29 U.S.C. § 501(b).

5. Appellants argue to us that Section 501 (b), note 4 *supra*, furnishes explicit statutory authority for the award of counsel fees in the cases before us. They point to the fact that the complaints in three of the four cases refer to Section 501. We think, however, that the reliance was in reality upon the more specific sections of the statute referred to in the description given above of the separate law suits; and we note in this regard that the judgments of the District Court in the four suits identify these other sections as supplying the basis for the relief given by the court. The only judgment in which there is a reference to Section 501 is in the court's blanket recital of jurisdictional statutes in paragraph 1 in its conclusions of law in the Reinstatement Case. In

paragraph 2, it is clear that the court regarded Section 609 as the essential source of the right being enforced.

There has been some difference of approach with respect to the scope of the coverage of Section 501(a). *Compare* Gurton v. Arons, 339 F.2d 371, 375 (2d Cir. 1964), affirming Guarnaccia v. Kenin, 234 F.Supp. 429, 442–443 (S.D.N.Y. 1964), *with* Johnson v. Nelson, 325 F.2d 646, 650–651 (8th Cir. 1963) *and* Retail Clerks Union, Local 648 v. Retail Clerks International Ass'n, 299 F.Supp. 1012, 1021 (D.D.C.1969). In view of the result we reach in this opinion, we need not undertake to define the precise reach of Section 501(a). We are satisfied in any event that it was not the primary statutory foundation of the rights asserted in the four cases giving rise to the appeals before us.

6. One of the most serious inadequacies of the Senate bill is the lack of any effective enforcement procedure to protect union members from those few union officials who fail to recognize that a union belongs to its members. Under that bill the individual member must shoulder the burden of litigation costs himself. The union officer, on

a similar individual lament by Senator Goldwater in testimony before a House Committee after the passage of the Senate Bill.[7]

These statements, although plainly indicative of a feeling by some members of the Congress that it would have been desirable and prudent to spell out unmistakably a right to attorney's fees as a remedial adjunct of the successful prosecution of the substantive rights created by the Act, hardly amount to a definitive and absolute setting of the Congressional face against the giving of such incidental relief by the courts where compatible with sound and established equitable principles. There are other expressions by sponsors of the Act which indicate variously a purpose to afford the courts "a wide latitude to grant relief according to the necessities of the case," and "to give such relief as [the court] deems equitable in all the circumstances."[8] It seems to us most unlikely that the Congressional perceptions of the needs for greater democracy and fair dealing in internal union affairs, which sparked the passage of the LMRDA, did not extend as well to the vital role of the equity powers of the judiciary in meeting those needs.

Neither do we find *Fleischmann* as persuasive on this score as did the District Court. There, one business corporation sued another for trademark infringement under the Lanham Act. That statute, as the Supreme Court was at pains to point out, was precise in its specification of remedies, which included recovery of a defendant's profits, plaintiff's damages, and costs of the action, with the court authorized to treble the damages found to have been sustained —an authority which could, as a practical matter, be used to mitigate the burden of counsel fees. Moreover, *Fleischmann* did not involve the carrying of the burdens of litigation by an individual for the benefit of a larger class, as is asserted to be true in the case before us.

The Third Circuit has considered at length the question of whether the absence of explicit statutory authorization nullifies judicial power to award legal fees in LMRDA litigation, and, in a decision which appellees recognize to be squarely contrary to that of the District Court, has rejected that position. Gartner v. Soloner, 384 F.2d 348 (3rd Cir. 1967), cert. denied, 390 U.S. 1040, 88 S. Ct. 1633, 20 L.Ed.2d 302 (1968). After examining the legislative history in

the other hand, have [*sic*] the entire resources of the union at their disposal. This impractical enforcement method is weakened still further in the committee bill.
H.R.Rep.No.741, 86th Cong., 1st Sess. 95, U.S.Code Cong. & Admin.News, (1959) p. 2492.

7.   [T]he bill does not grant [the union member], even where successful in his suit, reasonable counsel fees or other costs. It thus forces him to assume the entire financial burden of the litigation. For an ordinary rank-and-file union member who is generally a wage worker, such a litigation thus becomes an impossible financial burden. In recognition of these difficulties, the Fair Labor Standards Act, for example, requiring the payment of minimum wages and premium overtime pay for certain categories of workers, permits not only the worker himself to bring a suit for nonpayment (which he may do in the State as well as the Federal courts) and to recover attorneys' fees and court costs

if successful, but if the worker prefers, he may have the Secretary of Labor bring such suit in his behalf.
105 Cong.Rec. 10095.

8.   These are statements, respectively, by Representative Elliott and Senator Kuchel, 105 Cong.Rec. 15547–48 and 6717. The jurisdictional grant related to Title 1 of LMRDA recites that "[a]ny person whose rights secured by the provision of this subchapter have been infringed . . . may bring a civil action in a district court of the United States *for such relief* (including injunctions) *as may be appropriate* . . . " (Emphasis supplied) 29 U.S.C. § 412. This is followed by a savings clause for Title 1 which provides that nothing contained in the subchapter "shall limit the rights and remedies of any member of a labor organization under any State or Federal law or before any court or other tribunal . . . " 29 U.S.C. § 413. Section 603(a) is a savings clause of the same nature applicable to the entire Act.

depth, the court found no fixed purpose on the part of Congress to restrict the equity jurisdiction of the district courts in such manner as to bar counsel fees in every case. Looking to the Congressional objective of providing an enforceable bill of rights for union members, the court thought it most inconsonant to conclude that ". . . Section 102 [29 U.S.C. § 412, note 8 *supra*] of the LMRDA opens the door of the federal judicial system to the individual union member whose rights have been infringed upon except that stark reality might slam the door in that litigant's face when confronted with the insurmountable obstacle of prohibitive legal expenses . . ." 384 F.2d at 355. The recovery of counsel fees was thus regarded as falling within the investiture of the district courts by Section 102 with authority "to grant relief [including injunctions] as may be appropriate."

In this circuit we have approved the award by the District Court of counsel fees in Bakery & Confectionery Workers International Union v. Ratner, 118 U.S. App.D.C. 269, 335 F.2d 691 (1964). Although the fees awarded there were in part directed to an action under Section 501 of LMRDA, it also appears quite clearly that they were intended to cover also a separate suit founded upon Section 412 of the Act in respect of which there is no express statutory authorization for counsel fees. The District Court on at least two occasions has made similar fee awards. Retail Clerks Union, Local 648 v. Retail Clerks International Ass'n, 299 F.Supp. 1012 (D.D.C. 1969), and Cefalo v. District 50 UMW, 311 F.Supp. 946 (D.D.C.1970).[9]

Absent the positive interposition by Congress of a barrier to judicial allowance of attorney's fees, as we believe to be the case here, we note that there has been a recent reaffirmation by the Supreme Court, in a statutory context, of the inherent power of the district courts to award attorney's fees where an indi-

vidually initiated lawsuit has brought benefits to a wider group. Mills v. Electric Auto-Lite Co., 396 U.S. 375, 90 S.Ct. 616, 24 L.Ed.2d 593 (1970). That was a minority stockholders action to set aside a merger of their corporation with another. The cause of action sounded in the proxy solicitation provisions of Section 14(a) of the Securities Exchange Act and the rules issued under that statute.

In upholding the trial court's judgment that the proxy material was misleading, the Supreme Court remanded the case for determination of the appropriate relief to be given. In doing so, however, it ruled that the plaintiffs were entitled to an interim award of counsel fees, since "the litigation has conferred a substantial benefit on the members of an ascertainable class," and "[T]o allow the others to obtain full benefit from the plaintiffs' efforts without contributing equally to the litigation expense would be to enrich the others unjustly at the plaintiffs' expense." In addition to this classic statement of the equitable foundations of court-awarded counsel fees, *Mills* is significant for present purposes because of the Supreme Court's assertion that, despite the statutory source of the right asserted, fees were not precluded by reason of either (1) the absence of identifiable authority for them in the proxy statute itself, or (2) the express provision made for counsel fees in two other sections of the same Act.

■ We turn, then, to the merits of the District Court's observation that the Yablonski lawsuits did not benefit anyone except Yablonski. Preliminarily we remark that it is not enough to say, as did the District Court, that a "primary purpose" of the lawsuits was to facilitate Yablonski's candidacy. It is obvious that in virtually all litigation of this character, in the labor field or out, a plaintiff pursues his own interest as

---

9. *See also* Sands v. Abelli, 290 F.Supp. 677 (S.D.N.Y.1968). The Sixth Circuit appears to take a different view. Mc-

Craw v. United Ass'n of Journeymen and App. of Plumbing, 341 F.2d 705 (6th Cir. 1965).

well as that of others. The relevant question is whether or not the trouble he takes results in the actual conferring of benefits on others than himself.[10] Approached in this way, our examination of the record before us leaves us in no doubt that the institution of these lawsuits proved to be significantly beneficial to UMW and its members, not only in the immediate impact of the results achieved but in their implications for the future conduct of the union's affairs.

In passing LMRDA, the concern of Congress was focused, more intently than upon anything else, on the overriding importance to union democracy of free and fair elections. Each of the four lawsuits brought by Mr. Yablonski contributed, both in the short and the long run, to the achievement of this objective. The Reinstatement Case demonstrated that the courts would be quick to strike down any heavy-handed retaliation against a union member who dared to challenge the incumbent leadership. The Mailing List Case brought to the entire membership and to the individual locals information about candidates and election responsibilities which had never before been available in the UMW. The *Journal* Case established that incumbent officers could not discriminatorily employ the resources of the union to further their own perpetuation in office. Perhaps most importantly of all, the Fair Election Case resulted in a wholly unprecedented promulgation of detailed rules (largely as proposed by Mr. Yablonski) designed to assure fair and honest elections, thereby establishing a pattern which no future union leadership will lightly disregard.

We do not think the benefits issue needs the belaboring of detailed exposition. Surely few would claim that the results of these litigations have not made the UMW a more democratic union or membership in it a more valuable and dignified status. Certainly no member of Congress who voted for LMRDA would fail to recognize that in this instance the Act worked just the way it was intended to work, *i. e.*, advancing union democracy by opening up the courts to one directly aggrieved member for the benefit of all.

It is suggested that it is unfair to impose attorney's fees in cases which have never reached final adjudication on the merits. The Supreme Court in *Mills*, however, noted that the relevant inquiry is not into the technical posture of the litigation, but whether it "has conferred a substantial benefit on the members of an ascertainable class." 396 U.S. at 993–994, 90 S.Ct. at 626.

It is not decisive in this instance that three of the suits never got beyond the issuance of preliminary injunctions, and the fourth failed even to do that. The fact is that in the former three cases the preliminary injunction was the critical step and procured all the relief required; and in the fourth case the very filing of the complaint and the holding of a hearing on the motion for a preliminary injunction effected a change of position by the defendants which warranted the court's conclusion that no mandatory order was necessary to achieve the plaintiff's aims. As all lawyers know, a lawsuit does not always have to go to final adjudication on the merits in order to be effective. Assuming the effectiveness in terms of practical results, the litigating stage attained is relevant only to the amount of the fees to be allowed, and not to the issue of whether they should be awarded at all.[11]

10. The Supreme Court made clear in *Mills* that the judicial power to award counsel fees does not depend upon the creation by the litigation in question of a fund from which such fees can be paid nor upon whether the benefit conferred is pecuniary in nature. 396 U.S. at 392–396, 92 S.Ct. 616.

11. In Bakery & Confectionery International Union v. Ratner, *supra* p. 430, this court approved the award of attorney's fees in respect of a separate litigation which had not gone beyond the grant of a preliminary injunction. *See also* Kahan v. Rosenstiel, 424 F.2d 161 (3rd Cir. 1970), cert. denied, Glen Alden Corp.

For the reasons hereinabove set forth, the orders of the District Court denying the motions for the allowance of fees are reversed, and the four cases are remanded to the District Court for further proceedings consistent herewith.

It is so ordered.

v. Kahan, 398 U.S. 950, 90 S.Ct. 1870, 26 L.Ed.2d 290 (1970), where the Third Circuit authorized attorney's fees in respect of a suit which had become moot because of the concessions made by the

defendants in response to the filing of the complaint.

* Sitting by designation pursuant to 28 U.S.C. § 294(d) (1970).