**William R. VAN GEMERT, et al., Plaintiffs-Appellees,**

v.

**The BOEING COMPANY (formerly The Boeing Airplane Company), et al., Defendants-Appellants.**

**No. 551, Docket 77–7547.**

United States Court of Appeals, Second Circuit.

Submitted Aug. 18, 1978.

Decided Dec. 21, 1978.

Davis, Polk & Wardwell, New York City, for defendants-appellants.

Kass, Goodkind, Wechsler & Gerstein, New York City (Stuart D. Wechsler, William A. Kass, Robert S. Churchill, Samuel K. Rosen, Joseph V. Sternberg, New York City, of counsel), Nathan, Mannheimer, Asche, Winer & Friedman, New York City (Norman Winer, New York City, of counsel), Irving Steinman, New York City, for plaintiffs-appellees.

Louis J. Lefkowitz, Atty. Gen. of State of N.Y., New York City (Samuel A. Hirshowitz, First Asst. Atty. Gen., Warren M. Goidel, Carole L. Weidman, Arthur B. Wolfish, New York City, of counsel), for New York State Dept. of Audit and Control, amicus curiae.

George J. Solleder, Jr., Sp. Master, New York City, amicus curiae.

Before KAUFMAN, Chief Judge, and FEINBERG, MANSFIELD, MULLIGAN, OAKES, TIMBERS, GURFEIN, VAN GRAAFEILAND and MESKILL, Circuit Judges.

IRVING R. KAUFMAN, Chief Judge:

Attorneys litigating class actions have been variously described as "economically rational entrepreneurs," champions of aggrieved individuals for whom a conventional lawsuit would not be feasible, and the recipients of a "golden harvest of fees." These diverse perspectives, however, are united by a common theme of which we are not unaware. The conduct of class action litigation is affected by the principles governing the compensation of the attorneys who bring them.

Today we decide, in a case of first impression, that the fees and costs of counsel may be assessed against the unclaimed portion of a class action judgment. Our conclusion is predicated on considerations of equity and sound policy and is sustained as well by longstanding precedent. To hold otherwise, we believe, would engender serious unfairness to claiming class members and their lawyers, without any corresponding benefit to absentees. Moreover, a contrary result would place enormous pressure on attorneys to settle at all costs, and would deter them from instituting meritorious suits.

## I.

In February 1966, the Boeing Company decided to call for redemption its issue of 4½% Converted Subordinated Debentures, due July 1, 1980. Pursuant to the terms of the Indenture Agreement, Boeing published notices of its intention in two national newspapers. Boeing also mailed notices to those investors who had registered their debentures. Holders of $1,544,300 of unregistered debentures, however, did not learn of the call until after the conversion deadline of midnight, March 29, 1966, set by Boeing.

At the stroke of twelve their right to convert $100 in principal of bonds into two shares of common stock expired. The two shares were worth $316.25 that day, but the unwitting bondholders were left only with the small consolation of having the right to redeem for $103.25, a figure fixed in the Indenture.

William Van Gemert and several other nonconverting bondholders brought a class action against Boeing, alleging that they had received inadequate and unreasonable notice of Boeing's decision. The plaintiffs contended that Boeing was civilly liable under the Securities Exchange Act of 1934,[1] the Securities Act of 1933,[2] the Trust Indenture Act of 1939,[3] and New York law.[4]

After a full trial, Judge Ryan dismissed the complaint, having held that Boeing was required to do no more than fulfill notice requirements stated in the Trust Indenture Agreement. On appeal, we decided that the New York law of contracts imposed an implied duty on Boeing—not satisfied by its newspaper advertisements and "eleventh hour" news release—to provide reasonable notice of its intention to redeem the debentures. Accordingly, we held that Boeing was liable despite its compliance with the notice provisions of the Indenture Agreement and remanded the case to Judge Ryan for a determination of damages. *Van Gemert v. Boeing Co.,* 520 F.2d 1373, 1383 (2d Cir. 1975) [*Van Gemert I*].

Judge Ryan then proceeded to calculate damages based on the difference between the redemption price of the debentures and the value, as of March 29, 1966, of the

1. 15 U.S.C. § 78f. The plaintiffs contended that Boeing was liable under the Act for violating the New York Stock Exchange Listing Agreement and Section A10 of the New York Stock Exchange Company Manual, on the theory that the statute requires stock exchanges to adopt such rules.

2. 15 U.S.C. § 77a *et seq.*

3. 15 U.S.C. § 77aaa *et seq.*

4. This claim was heard pursuant to the pendent jurisdiction of the federal courts. *See United Mine Workers v. Gibbs,* 383 U.S. 715, 86 S.Ct. 1130, 16 L.Ed.2d 218 (1966).

shares of common stock into which they could have been converted. We affirmed this ruling, but held, contrary to Judge Ryan, that the plaintiffs were entitled to prejudgment interest. *Van Gemert v. Boeing Co.,* 553 F.2d 812, 813 (2d Cir. 1977) (*Van Gemert* II). Since $1,544,300 in principal amount of unregistered debentures had not been converted, it was a simple task to determine that the class members had suffered damages in the sum of $3,289,359.[5]

In the *Van Gemert* II appeal, the law firm of Kass, Goodkind, Wechsler and Gerstein, a member of the committee of attorneys for the plaintiffs,[6] urged for the first time that members of the class who filed proper proofs of claim should be permitted to receive, on a pro rata basis, the unclaimed portion of the total damage award. Boeing responded in opposition that these funds should be returned to it. Without reaching a conclusion as to the ultimate disposition of unclaimed damages, we rejected the firm's proposal. *Id.* at 815–16. Such a plan, we held, constituted a form of fluid class recovery, involving distribution of the unclaimed portion of the judgment to a "next-best" class in contravention of *Eisen v. Carlisle & Jacquelin,* 479 F.2d 1005 (2d Cir. 1973), *vacated and remanded on other grounds,* 417 U.S. 156, 94 S.Ct. 2140, 40 L.Ed.2d 732 (1974). We stated that the procedure suggested by the Kass firm would result in the expropriation of the claims of the silent class members and accordingly, create a windfall for those who filed claims. The panel also concluded that

the proposal could not be justified on the ground that claiming class members would use a portion of the unclaimed funds to defray their legal expenses. This, it was decided, would require Boeing to pay indirectly for the legal expenses of successful litigants.

Upon a second remand to Judge Ryan for entry of judgment, he ordered that plaintiffs' attorneys be awarded their fees, expenses and disbursements from the total amount of the judgment. He concluded that it was equitable for all class members—claiming and nonclaiming alike—to bear a pro rata share of the costs of producing the judgment in their favor.[7] Boeing appealed this ruling as contrary to the mandate of *Van Gemert* II, contending that the attorneys should receive compensation only from the claimed portion of the judgment.

A panel of this court, in an opinion written by Judge Van Graafeiland, held that the claims of individual class members could not be treated collectively, as if they belonged to the class as a whole, and that because absent class members had not received the benefit of the attorneys' labors, no charge or assessment may be made against their undistributed shares. *Van Gemert v. Boeing Co.,* 573 F.2d 733, 736 (2d Cir. 1978) (*Van Gemert* III).[8]

Because of the significance of the issues in this case for the conduct of class action litigation, we decided to rehear the case *en banc.*[9] We now affirm the judgment of the district court.

---

5. According to the report of the Special Master appointed by Judge Ryan, filed with this court as a brief *amicus curiae,* the judgment fund now exceeds $6,500,000, including prejudgment interest.

6. The other members of the committee were Nathan, Mannheimer, Asche, Winer & Friedman, and Irving Steinman.

7. Under Judge Ryan's order, each class member's contribution to the total amount of attorneys' fees must bear the same ratio to all such fees as his own recovery bears to the total class recovery.

8. Judge Oakes dissented in part on the ground that the principles governing the award of attorneys' fees are inapplicable to costs and disbursements. *Van Gemert* III, 573 F.2d at 738.

9. Having briefed the issue at our request, Boeing presents the threshold argument that under the "law of the case doctrine," *Van Gemert* II precludes the recovery of costs and attorneys' fees from the unclaimed portion of the bondholders' judgment. We cannot accept this contention.

*Van Gemert* II held that class members who filed proofs of claim could not be awarded the unclaimed portion of the judgment on a pro rata basis, even if some of those funds were to be used to pay their lawyers. To allow the money judgment to be distributed in such a fashion would countenance "expropriation" of the shares of absentees, and would enable well-

## II.

Any consideration of the propriety of awarding attorneys' fees in the federal courts must begin with *Alyeska Pipeline Service Co. v. Wilderness Society,* 421 U.S. 240, 95 S.Ct. 1612, 44 L.Ed.2d 141 (1975). In that seminal case, the Supreme Court decided that, absent statutory authorization, the federal courts may not shift the costs of litigation from the winning to the losing party. The *Alyeska* Court noted, however, that there are two exceptions to this rule. First, there is inherent power in the courts to assess attorneys' fees for the "willful disobedience of a court order," or when a party has acted in bad faith, *id.* at 258–59, 95 S.Ct. at 1622. Second, historically, the federal courts have exercised an equitable power to allow attorneys' fees and costs to be charged against a fund created, increased, or protected by successful[10] litigation. *Id.* at 257–58, 95 S.Ct. 1612.

■ The application for the fees may be made by the plaintiffs themselves, *Trustees v. Greenough,* 105 U.S. 527, 26 L.Ed. 1157 (1881), on the ground that they have per-

formed a service benefiting others similarly situated. But a plaintiff's attorney may himself present a claim to compensation and reimbursement for expenses from the fund, on the theory that he has provided or preserved a benefit—the fund itself—and that the reasonable value of his services should be borne proportionately by all plaintiffs. *Central R.R. & Banking Co. v. Pettus,* 113 U.S. 116, 5 S.Ct. 387, 28 L.Ed. 915 (1885).

The paradigmatic common fund is an express trust, as in *Greenough.* Litigation can also "create" a fund, as when the assets of a debtor are brought within the reach of creditors, *Pettus, supra.* Nevertheless, the common fund doctrine has not been restricted to equitable actions in which the court exercised control over a "res". In *City of Detroit v. Grinnell Corp.,* 495 F.2d 448, 454, 468–69 (2d Cir. 1974), we awarded attorneys' fees out of the settlement fund in a private antitrust class action suit. Similarly, since a money judgment is itself an identifiable asset on which the trial court may impose a charge, such judgments

informed claimants to avoid paying any attorneys' fees at all. *Van Gemert* III raises the wholly different question whether the lawyers for the class may be awarded their fees and disbursements from the judgment considered as a common fund. The claiming class members will not receive a "windfall," for no payment of funds to a "next-best" class of persons is contemplated by Judge Ryan's order. Rather, the costs of the litigation will be borne by the entire fund, and each class member will be required to pay his proportionate share of attorneys' fees.

Even if *Van Gemert* II had reached the issue raised on this appeal, the law of the case doctrine would not dictate that we treat its ruling as dispositive. Boeing, citing *Bromley v. Crisp,* 561 F.2d 1351, 1363 (10th Cir. 1977) (*en banc*), *cert. denied,* 435 U.S. 906, 98 S.Ct. 1458, 55 L.Ed.2d 497 (1978), and *Lathan v. Brinegar,* 506 F.2d 677, 691 (9th Cir. 1974) (*en banc*), argues that it would be prudent for the court sitting *en banc* to consider itself bound by the law of the case established by a panel on an earlier appeal, when that ruling was not reviewed *en banc.*

We believe, however, that such a rule would be far too restrictive and that, sitting *en banc,* we may overrule any panel decision that a majority of the active judges believes was wrongly decided, unless a party would be seri-

ously prejudiced as a result, *First National Bank of Hollywood v. American Foam Rubber Corp.,* 530 F.2d 450, 453 n.3 (2d Cir. 1976). The purpose of the "law of the case" doctrine is to prevent the continuous relitigation of issues decided by a panel at an earlier stage of a suit. The doctrine, which is in any event no more than an appeal to the "good sense" of the court, *see, e. g., Zdanok v. Glidden Corp.,* 327 F.2d 944, 952–53 (2d Cir. 1964), is properly applied to the district court and to other panels of the Court of Appeals. It cannot immunize panel decisions from review by the court *en banc. Accord, In re Central R.R. Co.,* 485 F.2d 208, 210–11 (3d Cir. 1973) (*en banc*). And, given the rarity with which petitions for rehearing *en banc* are granted, the spectre conjured by Boeing of continual "second guessing" of panel decisions is insubstantial indeed.

10. The common fund doctrine may be invoked only by successful litigants, *see Alyeska Pipeline Service Co. v. Wilderness Society,* 421 U.S. 240, 275, 95 S.Ct. 1612, 44 L.Ed.2d 141 (1975). It "would be a strange inversion if the [common fund] doctrine enabled losers in adversary contests to charge their counsel fees to winners." Dawson, *Lawyers and Involuntary Clients: Attorney Fees from Funds,* 87 Harv.L. Rev. 1597, 1626–27 (1974).

438

have also been accorded common fund treatment, see, e. g., Union Cent. Life Ins. Co. v. Hamilton Steel Prods., Inc., 493 F.2d 76 (7th Cir. 1974); see generally, Dawson, Lawyers and Involuntary Clients in Public Interest Litigation, 88 Harv.L.Rev. 849, 920 (1975); Dawson, Lawyers and Involuntary Clients: Attorney Fees from Funds, 87 Harv.L.Rev. 1597, 1620–24 (1974).

In Alyeska Pipeline Service Co., supra, 421 U.S. at 265 n.39, 95 S.Ct. 1612, 1625, the Supreme Court established criteria for determining whether benefits derived from litigation could properly be treated as a common fund. The Court stated that the common fund rationale was ill-suited to public interest litigation involving nebulous benefits accruing to a vast class of people. Accordingly, a common benefit did not accrue from litigation over the environmental impact of the trans-Alaska pipeline. The Court declared:

> In this Court's common-fund and common-benefit decisions, the classes of beneficiaries were small in number and easily identifiable. The benefits could be traced with some accuracy, and there was reason for confidence that the costs could indeed be shifted with some exactitude to those benefiting. In this case, however, sophisticated economic analysis would be required to gauge the extent to which the general public, the supposed beneficiary, as distinguished from selected elements of it, would bear the costs. Id.

■ We believe that the judgment against Boeing constitutes a common fund within the meaning of Alyeska.[11] The class of debenture holders here is comparable in size to that of the creditors in Pettus and the bondholders in Greenough. Moreover, the Van Gemert class is smaller than the class of 85,000 union members in Hall v. Cole, 412 U.S. 1, 93 S.Ct. 1943, 36 L.Ed.2d 702 (1973), and the 8,987 shareholders in Mills v. Electric Auto-Lite Co., 396 U.S. 375, 90 S.Ct. 616, 24 L.Ed.2d 593 (1970)—two cases cited with approval in Alyeska.[12] Nor is the class membership here difficult to identify for the purposes of tracing the benefits accurately. Unlike the sprawling throng of potential beneficiaries in Alyeska —all those who would derive benefits from a pristine Alaskan wilderness—the beneficiaries of this action form a well-defined class, limited to those who failed to convert unregistered bonds of a specific issue of Boeing debentures. The names of the individual bondholders are not, to be sure, always ascertainable. But since each unconverted debenture is readily identifiable— and in fact bears an explicit number—it is quite evident that the damages owed to each plaintiff can be traced to each debenture with perfect accuracy. .Elementary arithmetic, not "sophisticated economic analysis", is all that is required to determine the distribution of benefits. To calculate the amount of the judgment, it was necessary only to subtract the redemption price of each debenture from the value of the two shares of common stock to which it could have been converted. And it is equally simple to prorate the cost of the suit with complete exactitude so that each debenture holder's recovery is taxed with the cost of vindicating his interest.[13] Indeed, the

11. The common fund doctrine also presupposes that the court has "the authority to adjudicate the rights and duties" of those with an interest in the fund, Dawson, supra, note 10 at 1618. Although the beneficiaries need not sue as a class to meet this criterion, United States v. ASCAP, 466 F.2d 917, 919 (2d Cir. 1972), a class action presents the clearest case for the exercise of such judicial authority. The plaintiffs in the suit before us were certified as a 23(b)(1) class under the Federal Rules. No class member could have opted out of such a suit even if he had desired to do so; once the class was certified, no other forum could have adjudicated their rights with respect to the fund.

12. In Brennan v. United Steelworkers of America, 554 F.2d 586 (3d Cir. 1977), the court ruled that a common benefit could accrue to a class of 1,400,000 union members, noting that the plaintiff class need not be small in "absolute numbers." Id. at 606. See also, Yablonski v. United Mine Workers of America, 151 U.S.App. D.C. 253, 466 F.2d 424 (1972), cert. denied, 412 U.S. 918, 93 S.Ct. 2729, 37 L.Ed.2d 144 (1973) (class of 162,000 union members).

13. See note 7 supra.

"identification" and "tracing" criteria are met more completely in the case before us than in either *Hall* or *Mills*, neither of which involved tangible economic benefits at all.

### III.

■ The panel in *Van Gemert* III held that the common fund doctrine requires that expenses be assessed only against those who have actually claimed the fruits of the litigation, because no one else has benefited from the suit. We believe this construction of the concept of a "benefit" is too narrow and is not supported by the common fund case law. In *Greenough*, the Court noted that not every bondholder had filed claims against the fund, but nevertheless charged the entire fund with costs and fees. 105 U.S. at 529, 531, 26 L.Ed. 1157. In *Sprague v. Ticonic National Bank*, 307 U.S. 161, 59 S.Ct. 777, 83 L.Ed. 1184 (1939), the plaintiff sued individually to establish her right, as a beneficiary of a trust consisting of bonds held by a bank, to a lien on the proceeds from the sale of the bonds. In the process, she established the right of thirteen other beneficiaries to recover a share of the trust's assets. The Court, in an opinion by Justice Frankfurter, allowed the plaintiff to recover her attorney's fees out of those assets, although it was by no means clear that the other *cestuis que trust* would bring

suit. If a plaintiff class-member is adjudicated to have an interest in a fund, he has benefited within the meaning of the common fund doctrine.[14]

The rationale for such a rule is evident, as the case before us indicates. A portion of the judgment won by plaintiffs' attorneys—at least $213 for each unconverted debenture—is due every member of the class. Each plaintiff has a present vested interest in the class recovery, and his share of the judgment may be received on request. It cannot be urged convincingly, then, that the absent plaintiffs have not received a benefit from the litigation.

■ Our conclusion that the district court properly charged attorneys' fees against the shares of nonclaiming class members is far from heretical. At common law, an attorney's lien attached to a judgment obtained for his client, as security for his fees and expenditures. *See* Restatement (2d) Agency § 464(e). Under this doctrine, which is as American as the "American Rule" against charging the losing party with the fees of his adversary, the attorney is *himself* entitled to have the judgment enforced and compensation paid, *id.* and comment n.; *Falcone v. Hall*, 98 U.S.App.D.C. 363, 235 F.2d 860 (1956). Indeed, in *Pettus*, Justice Harlan noted that under state law the lien of plaintiffs' attor-

---

14. Citing the venerable Williston, our Brother Van Graafeiland maintains that the common fund doctrine is inapplicable unless the benefit conferred is knowingly accepted. Any requirement that the absentees actually file claims, however, is foreclosed by *Sprague* and *Greenough*. Moreover, as *Haynes v. Rederi A/S Aladdin*, 362 F.2d 345, 351 (5th Cir. 1966), *cert. denied*, 385 U.S. 1020, 87 S.Ct. 731, 17 L.Ed.2d 557 (1967) noted, it is sufficient if the attorneys' services and the benefits accruing from it are "impliedly" accepted. Manifestly, plaintiffs in a 23(b)(3) class action, who have been provided with notice and an opportunity to opt out of the suit, must be said to have accepted the attorneys' services, and the benefits that may flow from them.

Of course, class actions certified under Rule 23(b)(2) or, as in this case, 23(b)(1), do not contain an opt-out privilege. This reflects the conclusion of those who drafted the Rules that individual choice should be subordinated to the interests of the class as a whole to avoid incon-

sistent judgments or prejudice to absent class members. Because class certification represents a judicial determination that the absentees are adequately represented, it would frustrate the Rule if we were to require an investigation into each plaintiff's willingness to accept the benefits of the litigation.

Our conclusion rests on firm foundations, for absentees are in no way harmed by our decision. It simply does not accord with fact to argue, as the minority seems to, that because a deduction from the shares of unnamed plaintiffs has been made for attorneys' fees, they are being held liable for *more* than they have gained. If, as we hold, they have benefited from the judgment, it is appropriate to charge them their *pro rata* share. And if, as the dissent contends, they have gained nothing by the victory against Boeing, then it is difficult to understand how a deduction from the spoils of that victory can be said to have injured them. The dissenters cannot have it both ways.

ney could not be defeated by the successful purchase of the plaintiffs' claims. 113 U.S. at 127–28, 5 S.Ct. 387. Thus, since the attorney's right to his fee arose out of his creation of the judgment and not his client's receipt of the proceeds, our interpretation of the common fund doctrine is in harmony with time-honored principles of the common law.[15]

In contrast to the "expropriation" feared in *Van Gemert* II, deducting fees from each plaintiff's share in the judgment will not benefit some plaintiffs at the expense of others.[16] Each plaintiff will receive only his pro rata share of the recovery, less attorneys' fees, independent of the size of the unclaimed portion of the fund.[17] This is not a "fluid recovery" case.

■ We believe, moreover, that a ruling for Boeing would be unfair to both the claiming plaintiffs and the class attorneys, and would deter lawyers from bringing meritorious lawsuits. In setting attorneys' fees in class action litigation, courts must multiply the number of hours spent on the litigation by an appropriate hourly rate, and then adjust the fee to take into account the difficulty of the case, the attorney's risk in undertaking it, and the quality of representation.[18]

If victorious attorneys were permitted to charge fees only against claiming class members, the standards evolved by the courts to ensure rationality and fairness in fee setting would go for nought, because the compensation the attorney received would be dependent on a purely fortuitous event. It would not suffice to adopt a rule that the attorney's fee should be set at a fixed sum, calculated by considering the factors described above, but chargeable only against the recovery of those who claimed their shares. In suits in which a relatively small number of claimants come forward, the attorney's fee would leave those claimants with no recovery at all—if,

---

**15.** The argument that there is no attorney-client relationship between the absentees and class counsel is not persuasive. A certification under Rule 23(c) makes the *class* the attorney's client for all practical purposes, *Developments in the Law: Class Actions*, 89 Harv.L.Rev. 1318, 1592–97 (1976). The judgment in a class action is not secure from collateral attack unless the absentees were adequately and vigorously represented. Without question, it is settled that the attorney is not free to advocate the interests of the named plaintiffs alone. *See Gonzales v. Cassidy*, 474 F.2d 67, 75–76 (5th Cir. 1973). And absentees do not cease to be clients simply because they fail to claim their portion of the class recovery.

It begs the question to argue that since absentees are not parties for all purposes, they cannot be parties when the objective is to award attorneys' fees. The absentees are certainly parties in the most fundamental sense, for, as we have already indicated, they are bound by the judgment. Whether a given procedural rule should be applied to those who are not named plaintiffs depends on the function of the rule. Absentees are not considered parties against whom counterclaims under Fed.R. Civ.P. 13 may be asserted, because "the right to counterclaim is readily subject to abuse as a tactical device to encourage plaintiffs to opt out." *See, e. g., Donson Stores, Inc. v. American Bakeries Co.*, 58 F.R.D. 485, 489 (S.D.N.Y. 1973). There can be no comparable objection to treating unnamed plaintiffs as parties for the purpose of assessing attorneys' fees, for no

affirmative burden is placed on them by our ruling today. Indeed, it is only when the case is resolved in their favor, because of their counsel's efforts, that fees are assessed.

**16.** We therefore do not find apposite to our holding today the concern expressed in *Van Gemert* II that claimants may be encouraged to keep absent class members uninformed about the judgment in their favor. In any event, the district judge will invariably require that adequate notice of the judgment be provided. In the instant case, Judge Ryan appointed a Special Master for this purpose, who sent notices to each individual whose name could be ascertained, and to all brokerage firms, banks, and other financial institutions, with instructions to transmit the notice to interested clients. Notice was also published once a week for three consecutive weeks in the *Wall Street Journal* and the *New York Times.*

Any alleged conflict of interest between the attorneys and the unnamed plaintiffs is vitiated here, as in every class action, by judicial supervision of the fee award.

**17.** We intimate no view as to the appropriate ultimate disposition of the remainder of the fund.

**18.** *See, e. g., City of Detroit v. Grinnell Corp.*, 495 F.2d 448 (2d Cir. 1974); *Lindy Brothers Builders, Inc. v. American Radiator and Standard Sanitary Corp.*, 487 F.2d 161 (3d Cir. 1973).

in fact, sufficient funds were claimed to pay the entire fee. In the instant case, each debenture holder had an economically significant interest in the litigation—and yet deducting attorneys' fees only from the claimed portion of the judgment may leave each plaintiff bereft of benefits.[19] Such a rule would indeed make this a "lawyer's lawsuit," *Van Gemert III, supra,* 573 F.2d at 735.

On the other hand, if we were to protect the plaintiffs by limiting the attorney to a fixed percentage of the judgment actually claimed, the resulting fee would be entirely dependent on the number of plaintiffs who came forward. Considerations of the difficulty of the case, the quality of representation, and the hours spent by the attorney, would not determine the ultimate size of the fee. Nor can the attorney always determine whether it would be worthwhile for him to undertake the risks of litigation, for the number of plaintiffs who will come forward after judgment is often unpredictable. Of course, the risk that only a fraction of plaintiffs will claim is greatest if the individual claims are small.[20] The percentage of class members who file claims, however, is not a function solely of the value of each plaintiff's stake in the litigation. In this very case, although the judgment gives each class member the right to twice his original investment in damages, only 20% of the judgment has been claimed after months of diligent efforts to locate absentees. The Special Master appointed by Judge Ryan attributed the low response to "both the passage of 12 years and the fact that the debentures were unregistered." [21] If the number of claiming plaintiffs were to become the dominant—indeed determina-tive—factor in setting appropriate attorneys' fees, lawyers would be discouraged from bringing class suits, regardless the merits of the case.

Refusing to charge fees against the entire judgment fund would also put a high premium on settling cases. When a class action is settled, the attorney's fee conventionally comes "off the top". *See, e. g., Blank v. Talley Industries,* 390 F.Supp. 1, 3 (S.D.N.Y.1975) (Weinfeld, J.). The attorney is assured of the full amount of the fee that the court has found to be reasonable, regardless of whether some of his clients have failed to claim.[22] To be sure, in determining fair compensation the judge may take into account the number of plaintiffs likely to claim, *id.,* but the claimed portion of the fund does not place a ceiling on the fee. *See, e. g., Voege v. Ackerman,* 70 F.R.D. 693 (S.D.N.Y.1976) (Weinfeld, J.). If an attorney's fee in a class action that goes to final judgment were so restricted, lawyers would be tempted to consider settling their clients' claims for less than adequate sums. Fee awards should not be so structured as to encourage such conduct.[23]

Finally, our holding is perfectly consistent with the "American rule". The rationale of that doctrine is that litigants should not be deterred from pursuing *bona fide* claims or defenses by fear that they will be burdened by the costs and attorneys' fees of their successful adversary. *See Fleischman Distilling Corp. v. Maier Brewing Co.,* 386 U.S. 714, 718, 87 S.Ct. 1404, 18 L.Ed.2d 475 (1967). Under today's decision, however, the fees of the attorneys for the class will be deducted from the amount for which

---

**19.** Judge Ryan has not yet fixed the attorneys' fees in this case.

**20.** The drafters of Rule 23(b)(3) contemplated that class actions would be utilized to enable those with individually non-viable claims to vindicate their interests. *See* Kaplan, *Continuing Work of the Civil Committee: 1966 Amendments of the Federal Rules of Civil Procedure I,* 81 Harv.L.Rev. 356, 397–98 (1967). The rule propounded by the dissenters would have a devastating effect on (b)(3) class suits.

**21.** Report of the Special Master, *supra* note 5, at 4.

**22.** Interim fees are often awarded after a settlement has been approved but before the parties have arrived at a plan of distribution to subclasses—and, of course, before individual claims have been filed. *See* 3 H. Newberg, *Class Actions* § 6975 at 1263–66 & n.10 (1977).

**23.** *See generally* Dam, *Class Actions: Efficiency, Compensation, Deterrence, and Conflict of Interest,* 4 J. Legal Studies 47, 56–60 (1975).

Boeing has *already* been held liable. There is no "surcharge" on the defeated litigant.

Affirmed.

VAN GRAAFEILAND, J., with whom Judges MULLIGAN and TIMBERS concur, dissenting:

With all respect to our colleagues in the majority, we believe they have allowed their enthusiasm for class litigation to lead them into approving an award to attorneys that cannot be justified under either contract or quasi-contract principles of law. In our view, there is no attorney-client relationship between the named plaintiffs' attorneys and the non-claiming absentee debenture holders upon which to base a claim reading in contract. Nor have the non-claiming absentees been unjustly enriched, so as to give the lawyers a quasi-contractual right of recovery based on quantum meruit. In short, we see nothing in this case that justifies an award of substantial fees to lawyers for work purportedly performed on behalf of persons who are not their clients and who, themselves, have not received a single penny as a result of the lawyers' efforts.

Little purpose would be served by simply repeating in this dissent what has already been said in prior opinions and is now being rejected by this en banc court. However, some repetition of both the law and the facts is necessary as a framework for the discussion that follows.

When Boeing, on July 15, 1958, offered its shareholders the right to subscribe to its debentures, the subscription rights were evidenced by warrants issued in the shareholders' names. Each warrant was fully negotiable, however, and could be transferred by delivery in blank. The transferee was entitled to use the warrant for subscription without having a new warrant issued. Approximately 7,000,000 rights were issued; and, between July 15, 1958, and July 29, 1958, the date the subscription offer expired, approximately 1,700,000 of them were traded on the New York Stock Exchange. During this same period, subscriptions having a total value of $29,578,-

500 were received by Boeing's transfer agent.

Between August 4, 1958, when the debentures were admitted to trading on the New York Stock Exchange, and March 29, 1966, when trading terminated, over $68 million in debentures were traded. Because the debentures, like the warrants, were in bearer form and negotiable upon delivery, there was no way of knowing in 1966 how many of them were still held by the original subscribers. Semi-annual interest on the debentures was collected by detaching a coupon and forwarding it to the Chase Manhattan Bank, the indenture trustee. A vast majority of the interest coupons were tendered to Chase by collecting banks on behalf of unidentified debenture holders. In those instances where coupons were tendered directly by debenture holders, Chase made a list of the tenderers which it retained for approximately six months.

As of March 8, 1966, there were approximately 27,000 debentures outstanding in the aggregate principal amount of $21,514,900. As of March 29, 1966, conversion rights had not been exercised for debentures in the face amount of $1,544,300.

During the next several months, ten separate actions were commenced against Boeing on behalf of non-converting debenture holders. The *Van Gemert* action was commenced on June 23, 1966. On July 21, 1966, upon the application of Boeing's attorneys, the district judge signed an order directing all present and former holders of unconverted debentures to show cause before him on September 6, 1966, why an order should not be entered determining that the action be maintained as a class action on their behalf, why they should not be permitted to appear and intervene in the action and present claims, if any, and why they should not be included in the class and bound by the final judgment. The court directed that Boeing give notice to the present and former debenture holders by mailing a court-approved form to those "whose addresses may be known to the defendants" and by publishing the notice twice a week for two successive weeks in the national

editions of the New York Times and the Wall Street Journal. Because there was no way Boeing could identify each holder of the bearer debentures as of March 29, 1966, it compiled a list of persons who it believed might at some time have had an interest in the unconverted debentures and addressed notices to all of them.

No one knows, of course, whether each putative class member received a copy of the notice. No one knows how many of them may have been dead or incompetent when the notice was sent. Indeed, to this date, no one can accurately identify all of the class members. Those persons who did receive notice found no reference therein to any legal representation for the class. No attorneys except Boeing's were named or described. Nothing was said about attorneys' fees or disbursements. No mention was made of a "fund" from which the attorneys would be paid.

These absentee debenture holders did not become clients of the attorneys for the named plaintiffs, nor of those attorneys who were subsequently appointed by the district court to serve as the "representative committee" of plaintiffs' attorneys. 3 H. Newberg, *Class Actions* ¶ 6824C at 1147 (1977). Indeed, for most purposes, the absentees could not even be considered parties to the law suit. *See In re Four Seasons Securities Laws Litigation,* 525 F.2d 500, 504 (10th Cir. 1975); *In re Sugar Industry Antitrust Litigation,* 73 F.R.D. 322, 348–49 (E.D.Pa.1976); *Lamb v. United Security Life Co.,* 59 F.R.D. 44, 48–49 (D.C. Iowa 1973); *Donson Stores, Inc. v. American Bakeries Co.,* 58 F.R.D. 485, 489 (S.D.N.Y. 1973); 2 H. Newberg, *Class Actions, supra,* ¶ 2780 at 1249–50. Accordingly, we fail to see the significance of the majority's discussion of attorneys' liens, "clients" who have failed to claim, and "parties" who must bear their own attorneys' fees.

We do see significance, however, in the fact that attorneys who profess to be representing the interests of absentee class members have no hesitancy in leaving them without representation when the matter of attorneys' fees is at issue. *Cf. Cherner v.*

*Transitron Electronic Corp.,* 221 F.Supp. 55, 61 (D.Mass.1963). We believe that once an attorney undertakes to represent class interests, it makes no difference by whom he was retained; he owes to all class members a duty of equal and fair representation. *Berner v. Equitable Office Bldg. Corp.,* 175 F.2d 218, 220 (2d Cir. 1949). A conflict of interest that prevents full and fair representation not only violates Rule 23 but also raises a serious question of lack of due process. *See Carroll v. American Federation of Musicians,* 372 F.2d 155, 162 (2d Cir. 1967), *vacated and remanded on other grounds,* 391 U.S. 99, 88 S.Ct. 1562, 20 L.Ed.2d 460 (1968); *Phillips v. Klassen,* 502 F.2d 362, 366 (D.C.Cir.), *cert. denied,* 419 U.S. 996, 95 S.Ct. 309, 42 L.Ed.2d 269 (1974). If the absentee class members who have received nothing from the escrow fund were to discover that a group of unknown lawyers had received substantial awards from the absentees' undistributed shares, it is hard to believe that the absentees would not strenuously object to what must appear to them to be a lawyer's windfall. This is a viewpoint that should be expounded by the lawyers who claim to be the absentees' representatives. Instead, the lawyers advocate only their own cause and, as an incident thereto, the cause of their clients. This is a strange position indeed for lawyers who are seeking equitable relief from the courts. *Cf. National Association of Regional Medical Programs, Inc. v. Matthews,* 179 U.S. App.D.C. 154, 551 F.2d 340, 344–46 (1976), *cert. denied,* 431 U.S. 954, 97 S.Ct. 2674, 53 L.Ed.2d 270 (1977).

In *Van Gemert III,* 573 F.2d 733, we held that an award of fees under the equitable fund doctrine must be based on a theory of quantum meruit and that class attorneys should not be compensated for potential benefits not accepted by absent members of the class. Although we had no way of knowing at that time how much of the escrow fund would remain unclaimed, we stated that "the history of class litigation to date has demonstrated a surprisingly small response by absent members notified of their right to make claims." *Id.* at 736 n.4. This is one of the few statements in the

opinion that has withstood the careful scrutiny of our learned colleagues. As Chief Judge Kaufman points out, claims representing only twenty percent of the escrow account have been filed, and the filing deadline was September 1, 1978.[1] Taking into account that the named plaintiffs in the ten original lawsuits owned over ten percent of the unconverted debentures for which damages are being sought, the response by absentee holders is indeed small. At the present juncture, it appears that eighty percent of the fees and disbursements of the lawyers for the named plaintiffs will be paid from funds earmarked for absent class members who will not receive a penny.[2] We in the dissent do not believe that such a bizarre state of affairs can be justified simply by pointing to a "common fund" as the source of the lawyers' fees.

The "equitable" or "common" fund doctrine was created for the purpose of preventing unjust enrichment. *Mills v. Electric Auto-Lite Co.*, 396 U.S. 375, 392, 90 S.Ct. 616, 24 L.Ed.2d 593 (1970); *Fleischman Distilling Corp. v. Maier Brewing Co.*, 386 U.S. 714, 719, 87 S.Ct. 1404, 18 L.Ed.2d 475 (1967); *Grace v. Ludwig*, 484 F.2d 1262, 1269 (2d Cir. 1973), *cert. denied*, 416 U.S. 905, 94 S.Ct. 1610, 40 L.Ed.2d 110 (1974). There can be no unjust enrichment unless a benefit has been conferred and knowingly accepted. *Woodruff v. New State Ice Co.*, 197 F.2d 36, 38 (10th Cir. 1952); *In re Irving-Austin Bldg. Corp.*, 100 F.2d 574, 578 (7th Cir. 1938). *Williston on Contracts* puts it this way:

Three elements must be established in order that a plaintiff may establish a claim based on unjust enrichment. These elements are:

1. A benefit conferred upon the defendant by the plaintiff;

2. An appreciation or knowledge by the defendant of the benefit; and

3. The acceptance or retention by the defendant of the benefit under such circumstances as to make it inequitable for the defendant to retain the benefit without payment of its value.

12 *Williston on Contracts* § 1479 at 276 (3d ed. 1970).

This rule requiring a knowing acceptance of benefits applies to a fund created through the efforts of an attorney. *See Haynes v. Rederi A/S Aladdin*, 362 F.2d 345, 351 (5th Cir. 1966), *cert. denied*, 385 U.S. 1020, 87 S.Ct. 731, 17 L.Ed.2d 557 (1967); *Lea v. Paterson Sav. Inst.*, 142 F.2d 932, 934 (5th Cir. 1944). Newberg describes its application to class recovery funds as follows:

Absent class members have no obligation to pay attorneys' fees and litigation costs, except when they elect to accept the benefit of the litigation. Absent class members who accept any part of any recovery fund are liable for their proportional share of fees and costs. The attorney who creates a fund is entitled to a fee from each class member who accepts the benefits of the fund.

2 H. Newberg, *Class Actions, supra*, ¶ 2780 at 1249.

Another established rule of quasi-contract law is that an innocent recipient of benefits cannot be held liable to any greater extent than the amount by which he has been enriched. *Hill v. Waxberg*, 237 F.2d 936, 939 (9th Cir. 1956); *In re Irving-Austin Bldg. Corp., supra*, 100 F.2d at 578; *Dunn v. Phoenix Village, Inc.*, 213 F.Supp. 936, 952–53 (W.D.Ark.1963); *Restatement of Restitution* § 1 comment e, § 155; Beale, *The Measure of Recovery Upon Implied and Quasi Contracts*, 19 Yale L.J. 609, 620–21 (1910).

No matter which of the foregoing rules is applied to the facts of this case, the order appealed from is wrong. The Special Mas-

---

1. The notice of availability of proofs of claim stated that any debenture holder who did not file by the deadline date would be precluded from participating in the award of damages.

2. It is possible that the September 1st deadline may be extended by the district court and that additional filings may reduce somewhat the eighty percent figure. However, the principle that one should not be required to pay for something he has neither requested nor received remains the same, whether the figure is eighty percent or one percent.

ter's notice to debenture holders made it clear that receipt of the notice did not mean that the recipient would ultimately be found entitled to participate in the award of damages. The burden was placed upon the recipient to establish his right of recovery and to submit executed proofs of claim and supporting documents by September 1, 1978. If the non-claiming absentees were not precluded after September 1, 1978, from participating in the fund, the day will surely come when they will be. We are convinced that these individuals, thus precluded from sharing in the "common fund", cannot be said to have accepted the benefits of the lawyers' efforts. Any charge levied against them for attorneys' fees is clearly in excess of benefits received.

When the panel in *Van Gemert I,* 520 F.2d 1373, found Boeing's notice of redemption to be inadequate, it directed that damages be awarded to the seven percent of debenture holders who did not convert, without considering whether their failure to convert might have resulted from some cause other than lack of notice. All the non-converters had to do in order to collect was to file a claim. The Court now holds that, insofar as the attorneys' right of recovery is concerned, it isn't even necessary that a claim be filed by the debenture holders. Our brothers will not allow the absentees' failure to file, whether caused by death, incompetency, incapacity, lack of knowledge, or unwillingness, to prevent the lawyers from taking their cut of the unclaimed moneys.[3]

This means that attorneys may sue on behalf of unknown and unnamed individuals, secure a money judgment, ostensibly on their behalf, and pocket a substantial part of the judgment funds earmarked for non-claiming absentees, without these absentees even knowing what has happened. Apparently, our colleagues in the majority either believe this is not occurring in the instant case or else deem its occurrence to be of no consequence.[4] We disagree on both counts. If lawyers must receive this sort of favored treatment to encourage the bringing of class actions, perhaps the game is not worth the candle; the public is giving up more than it is receiving in return.

We continue to believe that *Van Gemert III* was rightly decided, and we adhere to the views expressed therein.

---

3. Perhaps, as the majority opinion intimates, we in the dissent are too much influenced by "venerable" works such as Williston on Contracts. Whatever the reason, we are unable to visualize a situation in which a non-converting debenture holder who died before the action was commenced can become a client of the "class" attorneys or can "impliedly" accept the benefits of the attorneys' efforts.

We likewise cannot comprehend how the holder of a $100 debenture, who for any of a number of reasons does not collect, can be said to benefit to the same extent as the holder of a $100 debenture who does collect so that their "pro-rata" shares of attorneys' fees are the same.

4. The majority's attitude appears to be summed up in footnote 14 of the majority opinion where they say that deducting attorneys' fees from the "spoils" of the litigation cannot injure absentee class members who are not going to collect anyway.