**COUNTY OF SUFFOLK, a municipal, corporation, and Robert Alcorn, Christopher S. George, Fred Harrison, Peter Maniscalco, William F. Quinn, Robert Hoffman, Susan Chase, Yolanda Owens, James Roth, Myra Berkoff and Sandra Rosenberg on behalf of themselves and other similarly situated, Plaintiffs,**

v.

**LONG ISLAND LIGHTING COMPANY, et al., Defendants,**

and

**Long Island Power Authority, et al., Intervenors.**

No. 87–CV–0646 (JBW).

United States District Court, E.D. New York.

July 28, 1998.

Rivkin, Radler & Kremer, Uniondale, NY by Evan H. Krinick, Arthur J. Kremer, for Applicant LIPA.

LeBoeuf, Lamb, Greene & MacRae, LLP, New York, NY by Michael Lesch, Jon R. Mostel, Cynthia R. Clark, MarketSpan Corporation, Hicksville, NY, for Intervenor/Deft. MarketSpan.

Vladeck, Waldman, Elias & Engelhard, P.C., New York, NY by Karen Honeycutt, Julian Birnbaum, for the Class.

Zachary Carter, U.S. Attorney, Eastern District of New York, Brooklyn, NY by Igou M. Allbray, Assistant U.S. Attorney, for the United States of America.

Office of the Attorney General, Bureau of Consumer Frauds and Protection, New York, NY by Charlie Donaldson, Assistant Attorney General, for State of New York.

William D. Wexler, North Babylon, NY by Kevin Snover, also present.

*MEMORANDUM AND ORDER*

WEINSTEIN, Senior District Judge.

## TABLE OF CONTENTS

I. INTRODUCTION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .262

II PROCEDURAL BACKGROUND . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .262

III. RECENT INSTITUTIONAL CHANGES . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .264

IV. CONSTITUTIONALITY OF PROPOSED MODIFICATIONS . . . . . . . . . . . . . . . . . .264
 A. DUE PROCESS CLAUSE . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .264
 B. CONTRACT CLAUSE . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .267

V. EQUITY . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .269

VI. PROTECTION OF FUNDS PAYABLE . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .270

VII. CITIZENS ADVISORY PANEL . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .271

VIII. CONCLUSION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .271

## I. INTRODUCTION

The Long Island Lighting Company (LILCO) and the Long Island Power Authority (LIPA) have petitioned for a radical revision of LILCO's contractual and judicial obligations to pay electric ratepayers in Nassau, Suffolk and Rockaway, Queens, over $100,000,000 through rate reductions in 1998, 1999, and 2000. Instead of paying proportionally to the size of the electric bills, they propose to pay each ratepayer the same amount, reducing the payments due some ratepayers in order to increase payments to others. Instead of paying the full amount in monthly installments as reductions on electric bills, they seek to reduce the amount due by some $7,000,000 and to pay it in one lump sum by check. Instead of LILCO paying it, its partial successor, the MarketSpan Corporation, says it will pay the amounts due out of MarketSpan funds.

For the reasons stated below, this petition must be denied. There is no warrant in fact or in law for the state or one of its agencies to take the property of some ratepayers and pay it to others; or to restructure the contractual and judicial decree obligations of LILCO and shift them to another entity in the way proposed.

## II. PROCEDURAL BACKGROUND

This dispute involves a twenty four year old political and legal struggle over the provision of electric power to the residents of Long Island. The details of the story have been previously recounted. *See, e.g., County of Suffolk v. Long Island Lighting Co.,* 685 F.Supp. 38 (E.D.N.Y.1988); 710 F.Supp. 1387 (E.D.N.Y.1989), 710 F.Supp. 1405 (E.D.N.Y. 1989), 710 F.Supp. 1407 (E.D.N.Y.1989), 710 F.Supp. 1422 (E.D.N.Y.1989), 710 F.Supp. 1428 (E.D.N.Y.1989), 710 F.Supp. 1477 (E.D.N.Y.1989), 710 F.Supp. 1485 (E.D.N.Y. 1989), 710 F.Supp. 1487 (E.D.N.Y.1989), *aff'd as modified,* 907 F.2d 1295 (2d Cir.1990); 1995 WL 761828 (E.D.N.Y. Dec.19, 1995). For the purposes of this decision, it is only necessary to provide an abbreviated account of the underlying litigation.

At the center of the controversy stands the Long Island Lighting Company (LILCO), whose ill-fated efforts to construct the Shore-

ham nuclear power facility in Suffolk County resulted in a multi-billion dollar loss for the utility company. As a result of its successful petitions to the New York State Public Service Commission (PSC), LILCO began in 1974 to raise its electric rates in order to recoup its losses from the nuclear power fiasco.

In March of 1987 the rate increases became the subject of Racketeer Influenced and Corrupt Organizations (RICO) litigation. It was alleged that LILCO and those associated with it had fraudulently obtained rate increases from the PSC by making deliberate misrepresentations to the Commission respecting Shoreham. After the claims were severed and a judgment was issued against one of the plaintiffs, Suffolk County, the remaining plaintiffs were certified as a class of over one million past, present and future ratepayers of LILCO pursuant to Rule 23 of the Federal Rules of Civil Procedure. In February of 1989 a settlement was reached between the class and LILCO. Following hearings conducted in Nassau, Suffolk and Kings counties with respect to its fairness, the court approved the settlement. *See County of Suffolk v. Long Island Lighting Co.*, 710 F.Supp. 1428 (E.D.N.Y.1989), *aff'd*, 907 F.2d 1295 (1990). A consent decree incorporated the settlement terms. *See County of Suffolk v. Long Island Lighting Co.*, 710 F.Supp. 1487 (E.D.N.Y.1989).

Pursuant to the settlement and judgment, LILCO agreed to pay to the individual class plaintiffs a total of $390,000,000. All but $10,000,000 was to be paid in the form of credits on class members' electric charges. These payments were to be spread over the course of 10 years, commencing in December of 1990 and terminating in May of 2000. Payments were to be "in proportion to the electric rate payments that would otherwise have been made by each ratepayer." Stipulation of Partial Settlement of Rico Class Action and False Claims Action § 4e (February 27, 1989), *reprinted in County of Suffolk v. Long Island Lighting Co.*, 710 F.Supp. 1428, 1456–57 (E.D.N.Y.1989). In addition, LILCO provided a fund to reimburse the plaintiffs for legal fees and related costs. The plaintiffs also secured the establishment of a Citizens Advisory Panel (CAP) to assist and help protect Long Island's electric consumers.

In return for LILCO's promises, the plaintiff class agreed to release all its rights to sue on those RICO claims "which were or might have been brought from the beginning of time up to the date [of the settlement]." Stipulation of Partial Settlement of Rico Class Action and False Claims Action §§ 1(rr), 17(d) (February 27, 1989), *reprinted in County of Suffolk v. Long Island Lighting Co.*, 710 F.Supp. 1428, 1456, 1460–61 (E.D.N.Y.1989).

LILCO, along with its successor in delivering electric service to the ratepayers, LIPA, now petition for a "modification" of the settlement and decree. The use of the term "modification" denigrates the magnitude of the changes proposed. First, the applicants seek to accelerate the remaining approximately $110,000,000 of electric bill reductions, discounted at 6%, to a one time cash payback. Second, the applicants wish to substitute the per usage basis of repayment with a "per customer" basis; all current ratepaying entities or persons would receive the same rebate regardless of the size of the ratepayer's electric usage and bills. Were the second provision approved, those members of the class who are to receive the greatest compensation under the settlement would be relegated to collecting only a fraction of what is due to them.

The example of the modification's impact on the United States, one of the largest ratepayers on Long Island, is instructive. By virtue of its numerous facilities, the United States consumes a sizable amount of electric power. Under the terms of the settlement agreement, in which the United States played an active role by virtue of its status as plaintiff in a related case, *United States ex rel. Dick v. Long Island Lighting Co.*, 710 F.Supp. 1485 (E.D.N.Y.1989), the United States is entitled to receive a credit for approximately $441,000 of the remaining funds payable by LIPA–LILCO. Under the modifications proposed by the applicants, however, the United States would receive less than $17,000. *See* Letters from U.S. Dep't of Justice regarding County of Suffolk v. Long

Island Lighting Co. (June 25, 1998), opposing modification of decree. Other large commercial and governmental users stand to lose similar sums of money if the proposed modifications are approved.

Class counsel, all the named plaintiffs, and many ratepayers object to the proposed modifications. While Suffolk County objects, Nassau County and some of Nassau County's town officials support the proposals.

## III. RECENT INSTITUTIONAL CHANGES

In order to appreciate the complicated relationship among LILCO, BL Holding Corp., LIPA, Brooklyn Union Gas Corp., and MarketSpan Corp., and the method of converting this private utility, LILCO, to partial public ownership, a brief summary of recent events is necessary. Some detailed aspects of the labyrinthian arrangements, including, for example, the merger of KeySpan (the parent holding company of Brooklyn Union Gas), are omitted for the sake of simplicity.

The Long Island Power Authority was created as a state entity by legislation in 1986. *See* Long Island Power Authority Act, ch. 517, 1986 N.Y. Laws 1140 (codified as amended at N.Y. Pub. Auth. Law §§ 1020–1020–hh (McKinney 1994 & Supp.1998)). LIPA became a "corporate municipal instrumentality of the state . . . exercising essential governmental and public powers." N.Y. Pub. Auth. Law § 1020–c (McKinney 1994). It is controlled by fifteen trustees: nine are appointed by the governor, three by the president of the senate, and three by the speaker of the assembly. *See* N.Y. Pub. Auth. Law § 1020–d (McKinney Supp.1998). The legislature's design was for LIPA to acquire LILCO. *See* N.Y. Pub. Auth. Law § 1020–h (McKinney 1994).

In 1997 LILCO began a corporate transformation which ultimately resulted in its acquisition by LIPA. The conversion began with the shareholders of LILCO exchanging their shares of LILCO for 68% percent of the shares of another corporate entity, BL Holding Corp. (BL). Brooklyn Union Gas Corporation shareholders assumed ownership of the other 32% of BL. As a result of this transaction, BL became the sole shareholder of LILCO. BL then created and gave to its wholly owned subsidiary, MarketSpan, all of LILCO's natural gas distribution assets, its non-nuclear generation assets, its gas and electric common facilities, and all of the stock of what remained as LILCO.

MarketSpan then sold all of the shares of LILCO to LIPA. LIPA therefore acquired full ownership of LILCO and all those LILCO assets which had not been kept by MarketSpan, viz., the electric transmission and distribution network, the nuclear facility related debts, and tax certiorari claims against Suffolk and other municipalities.

When MarketSpan sold the remainder of LILCO to LIPA, the parties incorporated a "side letter" which contractually obligated MarketSpan to pay LIPA the "aggregate amounts required to be paid and/or credited by LILCO to members of the class pursuant to the Class Settlement : . . ." *See* Side Letter regarding Class Settlement Payments (May 28, 1998) (attached as Exhibit A to Reply Affidavit of Joseph E. Fontana in Further Support of the Joint Application for Acceleration of the Rate Reduction Plan).

In summary, a state agency, LIPA, has acquired complete ownership of LILCO as a shell corporation, some of the former assets of LILCO, and legal responsibility for satisfying LILCO's obligations under the RICO class action settlement and decree. MarketSpan has conceded in court that it has a contractual duty to pay LIPA the amounts which remain due on LILCO's obligation to pay ratepayers some $110,000,000 before May 2000. The ultimate legal responsibility to the class for these payments, however, still rests with LIPA which owns the LILCO corporation and its debts.

## IV. CONSTITUTIONALITY OF PROPOSED MODIFICATIONS

### A. DUE PROCESS CLAUSE

■ The first question is whether the proposed alterations of the settlement and decree would amount to a deprivation of property in violation of the Fourteenth Amendment of the United States Constitution and Article I, Section 7 of the New

York State Constitution. *See* U.S. Const. amend. XIV, § 1; *Webb's Fabulous Pharmacies, Inc. v. Beckwith*, 449 U.S. 155, 160, 101 S.Ct. 446, 66 L.Ed.2d 358 (1980) (Takings Clause of Fifth Amendment "applies against the States through the Fourteenth Amendment"); N.Y. Const. art. I, § 7 ("Private property shall not be taken for public use without just compensation.").

The answer is "yes." The Federal Constitution and the New York Constitution would be violated were the proposal approved. The applicants are petitioning the court to alter what is a money judgment that was offered to the plaintiffs and accepted by them in consideration for their release of past claims.

 It is a long-established principle of American law that a final money judgment gives rise to a "vested right" which entitles the judgement creditor to the same constitutional protections afforded other forms of property. *See, e.g., Hodges v. Snyder*, 261 U.S. 600, 603, 43 S.Ct. 435, 67 L.Ed. 819 (1923) ("the private rights of parties which have been vested by the judgment of a court cannot be taken away by subsequent legislation, but must be thereafter enforced by the court regardless of such legislation"); *McCullough v. Virginia*, 172 U.S. 102, 123–24, 19 S.Ct. 134, 43 L.Ed. 382 (1898); *Pennsylvania v. Wheeling & Belmont Bridge Co.*, 59 U.S. (18 How.) 421, 431, 15 L.Ed. 435 (1852) ("[I]f the remedy in this case had been an action at law, and a judgment rendered in favor of the plaintiff for damages, the right to these would have passed beyond the reach of the power of congress."); *Benjamin v. Jacobson*, 124 F.3d 162, 176 (2d Cir.1997) ("It is well-settled that a final money judgment creates a 'vested right' and hence a constitutionally protected property interest."); *Georgia Ass'n of Retarded Citizens v. McDaniel*, 855 F.2d 805, 810 (11th Cir.1988) ("rights fixed by judgment are, in essence, a form of property over which legislatures have no greater power than any other [property]"), *cert. denied*, 490 U.S. 1090, 109 S.Ct. 2431, 104 L.Ed.2d 988, (1989); *see also Plaut v. Spendthrift Farm, Inc.*, 514 U.S. 211, 115 S.Ct. 1447, 131 L.Ed.2d 328 (congressional act which sought to retroactively modify a final judicial order is unconstitutional on sep-aration of powers grounds). Because the property of judgment creditors is protected from uncompensated takings by legislatures, *a fortiori* it is also protected from the efforts of state agencies, such as LIPA, to take it away or transfer it to others.

Since the nation's earliest history, the federal courts have found it necessary to defend the efficacy of their orders and judgments against the encroachment of state officials. As Chief Justice Marshall put the matter in an 1809 foundational constitutional ruling:

> If the legislatures of the several states may, at will, annul the judgments of the courts of the United States, and destroy the rights acquired under those judgments, the constitution itself becomes a solemn mockery; and the nation is deprived of the means of enforcing its laws by the instrumentality of its own tribunals.

*United States v. Judge Peters*, 9 U.S. (5 Cranch) 115, 136, 3 L.Ed. 53 (1809) (Marshall, C.J.). For some of the many subsequent examples of the suzerainty of federal judicial decrees over state legislative and administrative actions, *see, e.g., Washington v. Washington State Commercial Passenger Fishing Vessel Assoc.*, 443 U.S. 658, 692–96, 99 S.Ct. 3055, 61 L.Ed.2d 823 (1979) (treaty respecting Indian fishing rights); *Cooper v. Aaron*, 358 U.S. 1, 18–19, 78 S.Ct. 1401, 3 L.Ed.2d 5 (1958) (desegregation decree); *Ableman v. Booth*, 62 U.S. (21 How.) 506, 16 L.Ed. 169 (1858) (writ of habeas corpus).

 The fact that plaintiffs who acquired property rights by the consent settlement were organized as a certified class cannot excuse repudiation of the rights of the individual judgment creditor-members of that class. *See Van Gemert v. Boeing Co.*, 590 F.2d 433, 439 (2d Cir.1978) (en banc) ("[e]ach plaintiff has a present vested interest in the class recovery"), *aff'd*, 444 U.S. 472, 481–82, 100 S.Ct. 745, 62 L.Ed.2d 676 ("The members of the class, whether or not they assert their rights, are at least the equitable owners of their respective shares in the recovery."). Class actions are predicated on the notion that the interests of all class members are fully represented through the class representatives and through class counsel. It is as if each sues individually in a consolidated ac-

tion. All party-members, including absent members and future members, are equally bound by the strictures of the class action judgment. *See, e.g., In re Joint Eastern & Southern Districts Asbestos Litigation (Johns–Manville Corporation),* 878 F.Supp. 473 (E. & S.D.N.Y.1995); *In re "Agent Orange" Product Liability Litigation,* 597 F.Supp. 740 (E.D.N.Y.1984); *see also Hansberry v. Lee,* 311 U.S. 32, 42, 61 S.Ct. 115, 85 L.Ed. 22 (1940) (judgment is *"res judicata* as to members of the class who are not formal parties to the suit").

In the instant case all past, present, and future class members relinquished valuable rights in return for LILCO's monetary obligations under the settlement and the judgment. Since they are bound by the *res judicata* effect of the judgment to the same extent as the class representatives, each class member is entitled to the full legal benefits which flow to him, her, or it from the judgment. *Cf. Beecher v. Able,* 575 F.2d 1010, 1016 (2d Cir.1978) (modification may be appropriate with respect to the re-allocation of *excess* funds among the class).

To determine whether the proposed modifications are constitutional with respect to the Fourteenth Amendment's protection against uncompensated deprivations of property, the essential inquiry is whether the judgment is sufficiently final to have vested rights in the judgement creditors. The term "judgment creditor" is used here in reference to the plaintiff class, but in reality the applicants are also "judgment creditors" in the sense that they remain entitled to the benefits bargained for in the settlement agreement.

Meritless are the claimants' arguments that the consent judgment is not final and therefore not capable of vesting property rights. The consent money judgment is not too "prospective" in nature. Payments to members of the class are exactly computable and have been computed and paid to individual ratepayers over the past eight years. Nor is the judgment insufficiently "final" because it contemplates the court's power to make some minor modifications to ensure the viability of the original decree. *See Berger v. Heckler,* 771 F.2d 1556, 1569 (2d Cir.1985).

While it is true that certain portions of the consent decree remain to be carried out, it provides for precisely ascertainable payments. It is not simply an injunction which controls prospective activities. The money judgment in the instant case stands in sharp contrast to the ordinary "institutional reform" settlements that are characteristic of civil rights suits against state or federal authorities. *See* discussion of Equity, Part V., infra. This suit involved a private controversy which was ultimately resolved by a monetary judgment designed to rectify alleged past wrongs. It was not injunctive in nature. The plaintiffs agreed to release only those claims that were ripe as of the date of settlement. The judgment did not affect those claims which could arise from events which occurred after the settlement.

The defendant's payments were "prospective" only in the sense that they were to take the form of rate credits over a span of ten years. The amounts to be received by each ratepayer were clearly defined and have been credited in exact amounts to some million ratepayers through their individual bills each month pursuant to the settlement and decree.

The fact that the monetary judgment was not satisfied at once is not a ground for labeling it "prospective" and non-vested. The payments were to be spread throughout the ten year period because the defendant was financially incapable of making one lump sum payment. LILCO asked for prospective payments as a concession because it was close to bankruptcy at the time of the judgment and lacked sufficient assets.

The settlement order itself contains provisions for only minor modifications. As the Supreme Court has noted, every "final" judgment is subject to some degree of modification under Rule 60(b) of the Federal Rules of Civil Procedure on grounds such as excusable neglect, newly discovered evidence, fraud, or other reasons which "justify relief." *See Plaut v. Spendthrift Farm Inc.,* 514 U.S. 211, 233, 115 S.Ct. 1447, 131 L.Ed.2d 328 (1995) (citing Fed.R.Civ.P. 60(b)). The fact that courts retain a limited degree of discretion to modify final judgments does not, the Su-

preme Court has pointed out, "impose any legislative mandate-to-reopen upon the courts, but merely reflects and confirms the courts' own inherent and discretionary power, 'firmly established in English practice long before the foundation of our Republic,' to set aside a judgment whose enforcement would work inequity." *Id.* at 233–34, 115 S.Ct. 1447 (quoting *Hazel–Atlas Glass Co. v. Hartford–Empire Co.*, 322 U.S. 238, 244, 64 S.Ct. 997, 88 L.Ed. 1250 (1944)).

In this case, the central terms of the agreement, the money damages of the defendant and the release of all claims by the plaintiffs, have never been subject to substantial modification. The settlement and judgment explicitly provides that "[t]he District Court shall not enter any order which reduces or has the effect of reducing the total $390 million dollar amount of rate reductions agreed to." Stipulation of Partial Settlement of Rico Class Action and False Claims Action § 6(c) (February 27, 1989), *reprinted in County of Suffolk v. Long Island Lighting Co.*, 710 F.Supp. 1428, 1458 (E.D.N.Y.1989).

Modification authority provided in the original settlement was intended only to allow the defendant some limited measure of flexibility in the timing of the payments in the event that LILCO was not able, because of temporary financial stringencies, to comply with the mandated payment schedule. The settlement order provided: the "District Court, after hearing from the parties and interested persons, may defer to the following year, but not grant forfeiture or elimination of, all or any portion of the agreed upon reduction." Stipulation of Partial Settlement of Rico Class Action and False Claims Action § 6(c) (February 27, 1989), *reprinted in County of Suffolk v. Long Island Lighting Co.*, 710 F.Supp. 1428, 1458 (E.D.N.Y.1989).

In sum, the power to modify the settlement and consent judgment is not significantly different from that recognized in other final money judgments which give rise to vested property rights. The applicants' proposed radical and major restructuring would violate the state and federal constitutional protections against uncompensated takings of private property by a government entity—

here LIPA. As judgment creditors, the class members have a vested interest in the monetary judgment.

Under the proposed terms of the modification, class members using large amounts of power, such as the United States, would be deprived of over 95% of the money damages due to them from the judgment. LIPA may not now reallocate some class members' shares of the judgment to others simply because it prefers that someone else receive the money. The Framers of the Constitution considered such methods of expropriation without compensation beyond the legitimate scope of government action.

## B. CONTRACT CLAUSE

■ The proposed modifications are also invalid under the United States Constitution's Contract Clause. *See* U.S. Const. art. I, § 10.

■ In addition to their status as judicial judgments, settlement agreements such as the one now before the court are valid contracts. *See Rufo v. Inmates of Suffolk County Jail*, 502 U.S. 367, 378, 112 S.Ct. 748, 116 L.Ed.2d 867 (1992) ("A consent decree no doubt embodies an agreement of the parties and thus in some respects is contractual in nature."); *Local Number 93, Int'l Assoc. of Firefighters v. City of Cleveland*, 478 U.S. 501, 519, 106 S.Ct. 3063, 92 L.Ed.2d 405 (1986) (finding consent judgments to be "hybrids" of both contracts and judgments); *United States v. ITT Continental Baking Co.*, 420 U.S. 223, 235–37 & n. 10, 95 S.Ct. 926, 43 L.Ed.2d 148 (1975) (consent decrees "have attributes both of contracts and of judicial decrees"); *Application of County Collector of Winnebago County*, 96 F.3d 890, 894 (7th Cir.1996) (consent decree is "contract wrapped in a judgment with attributes of both").

Because the Contract Clause principle is so clear (and is effectively included in the Fifth and Fourteenth Amendment protections of property rights), it has not been cited often in recent times. The twentieth century lack of reliance on the Contract Clause contrasts sharply with the Clause's prominent origins and its frequent and extensive appli-

cation during the nineteenth century. It is one of the few personal guarantees of liberty contained in the original body of the Constitution and was responsible for many of the early Court's most famous pronouncements. *See, e.g., Trustees of Dartmouth College v. Woodward,* 17 U.S. (4 Wheat) 518, 4 L.Ed. 629 (1819).

A state may at times avoid the strictures of the Contract Clause by invoking its legislative prerogative under the rational basis standard. *See, e.g., Energy Reserves Group, Inc. v. Kansas Power & Light Co.,* 459 U.S. 400, 103 S.Ct. 697, 74 L.Ed.2d 569 (1983) (control of future gas prices); *Home Building & Loan Ass'n v. Blaisdell,* 290 U.S. 398, 54 S.Ct. 231, 78 L.Ed. 413 (1934) (extending time for redemption of mortgages). *But see Allied Structural Steel Co. v. Spannaus,* 438 U.S. 234, 98 S.Ct. 2716, 57 L.Ed.2d 727 (1978) (striking down legislation reducing pension rights as violation of Contract Clause); *United States Trust Co. of New York v. New Jersey,* 431 U.S. 1, 97 S.Ct. 1505, 52 L.Ed.2d 92 (1977) (declaring illegal retroactive reduction of guarantees to bond holders).

In cases such as the present one, where the state seeks to evade its financial contractual obligations, the Supreme Court has indicated that the courts must apply something higher than the rational basis standard. *See United States Trust Co. of New York v. New Jersey,* 431 U.S. 1, 26, 97 S.Ct. 1505, 52 L.Ed.2d 92 (1977) ("complete deference to a legislative assessment of reasonableness and necessity is not appropriate because the State's self-interest is at stake"). In the instant case, the defendants and the plaintiff class entered into a contractual relationship: individual members of the plaintiff class surrendered valuable rights in return for a promise of a large computable monetary settlement. Whatever the standard, LIPA, a state administrative body, has not offered a constitutionally acceptable legislative rationale for its proposed modifications. Its arbitrary assessment that residential ratepayers are more worthy of its generosity than are large commercial and governmental ratepayers, and that the former may take some of

the assets of the latter, can not pass constitutional muster.

LIPA's preferences for certain members of the class is plainly stated in its application to the court: "[m]odifying the basis for distribution under the Rate Reduction Plan from a usage to a per customer basis will provide the most meaningful relief to the great majority of LIPA ratepayers—residential ratepayers—because any usage-based refund would weigh more heavily in favor of large commercial users of electricity." Joint Application of LIPA & LILCO for Acceleration of the Rate Reduction Plan at 4.

The applicants cannot offer even a rational basis for the redistribution of rights under the judgment. They attempt to justify it on the theory that the credits which are owed under the judgment are not as "meaningful" to the large ratepayers as they are to the residential ratepayers.

> [I]f you were to do this on a per usage basis ... you would find that the average large customer might get a check, for instance, Suffolk County, for example, maybe $1200 which wouldn't be that meaningful to the County of Suffolk, but it would reduce the amount of money that would go to its residential ratepayers ....

Transcript of June 19, 1998 hearing at 27 (statement of Richard M. Kessel, Chairman of LIPA).

LIPA currently possesses the freedom to exercise its policy preferences for classes of rate payers prospectively in the establishment of new rates. It may not, however, in the absence of the protections afforded by rational, constitutionally acceptable legislative processes, retroactively reach back and alter the conditions of its preexisting contractual obligations to individual ratepayers. *See United States Trust Co. of New York v. New Jersey,* 431 U.S. 1, 31, 97 S.Ct. 1505, 52 L.Ed.2d 92 (1977) ("State is not free to impose a drastic impairment when an evident and more moderate course would serve its purposes equally well."). It cannot arbitrarily favor some members of the class over others in the performance of its contractual obligations. The Equal Protection Clause of the Fourteenth Amendment as well as the Due Process and Contract Clauses of the

Federal Constitution and Article I of the New York State Constitution protect against such invidious state action.

## V. EQUITY

 Courts on occasion retain some discretion to effect equitable modifications of consent settlements. *See, e.g., Rufo v. Inmates of Suffolk County Jail,* 502 U.S. 367, 112 S.Ct. 748, 116 L.Ed.2d 867 (1992). Here, where the applicants' proposed modifications are so detrimental to the rights of some members of the class that the issue takes on constitutional dimensions, there can be little doubt that the district court is constrained in the exercise of its equitable powers. The inequity of the proposed modifications furnishes sufficient alternative grounds for rejecting the broad powers the petitioners would afford this court.

Modifications are sometimes appropriate in institutional reform litigation that involves prospective injunctions designed to remedy ongoing violations of state or federal law. *See, e.g., Rufo,* 502 U.S. at 380–81, 112 S.Ct. 748 ("The upsurge in institutional reform litigation ... has made the ability of a district court to modify a decree in response to changed circumstances all the more important.") (citation omitted).

Major court ordered modifications are not appropriate in cases such as the present one where one party offers a money judgment as compensation for past conduct. This distinction was made clear by the Supreme Court in language still informative:

A continuing decree of injunction directed to events to come is subject always to adaptation as events may shape the need. The distinction is between restraints that give protection to rights fully accrued upon facts so nearly permanent as to be substantially impervious to change, and those that involve the supervision of changing conduct or conditions and are thus provisional and tentative.

*United States v. Swift & Co.,* 286 U.S. 106, 114, 52 S.Ct. 460, 76 L.Ed. 999 (1932) (modification of Sherman Act decree); *accord Rufo,* 502 U.S. at 379, 112 S.Ct. 748.

Allocation of the money judgment presently at issue is not an appropriate subject of modification; it was based on rights and facts which had "fully accrued" as of the date of the settlement. As already noted, the plaintiffs relinquished their rights to sue for past violations in return for a definite and calculable sum and method of payment. There was nothing "provisional" or "tentative" about the amounts or the basis of payments in the original settlement, and these elements cannot be modified now.

The court's discretion rarely, if ever, extends to modifications which directly contradict the fundamental expectations underlying the original settlement. *See United States v. United Shoe Machinery Corp.,* 391 U.S. 244, 248, 88 S.Ct. 1496, 20 L.Ed.2d 562 (1968) (holding that even injunctive relief "may not be changed in the interests of the defendants if the purposes of the litigation as incorporated in the decree ... have not been fully achieved"); *Berger v. Heckler,* 771 F.2d 1556, 1568 (2d Cir.1985) ("The court is not entitled to expand or contract the agreement of the parties.").

Applicants seek to justify the proposed modifications on the grounds that they "further the purposes" of the original consent settlement. *See* Reply Memorandum in Further Support of Joint Application at 6, title of section II.B ("The Purpose Of The Consent Decree Will Be Furthered By The Requested Modification"). The creativity of this argument brings to mind the wise counsel offered by Justice Thurgood Marshall:

Consent decrees are entered into by parties to a case after careful negotiation has produced agreement on their precise terms. The parties waive their right to litigate the issues involved in the case and thus save themselves the time, expense, and inevitable risk of litigation. Naturally, the agreement reached normally embodies a compromise; in exchange for the saving of cost and elimination of risk, the parties each give up something they might have won had they proceeded with the litigation. Thus the decree itself cannot be said to have a purpose; rather the parties have purposes, generally opposed to each other, and the resultant decree embodies as much

of those opposing purposes as the respective parties have the bargaining power and skill to achieve. For these reasons, the scope of a consent decree must be discerned within its four corners, and not by reference to what might satisfy the purposes of one of the parties to it. *United States v. Armour & Co.*, 402 U.S. 673, 681–82, 91 S.Ct. 1752, 29 L.Ed.2d 256 (1971).

No basis and no support is offered for the applicants' assertion that "[t]he settlement favored commercial ratepayers to stem the flow of businesses from Long Island." Reply Memorandum in Further Support of Joint Application at 8. Nowhere in the settlement agreement itself is there any mention of this concern. It strains credulity to suggest that the agreement should be conceived of simply as a memorialization of economic protectionism. If the applicants were allowed such latitude in the construction of the agreement they could convert the agreement into an expression of any purpose which now suits their needs.

Boiled down to its essential terms, the agreement involved a release of legal RICO claims in exchange for the payment of money. The method of calculating the rate reductions was an essential feature of the agreement because it determined the amount of LILCO's payments to the individual members of the plaintiff class. Undoubtedly the large commercial ratepayers desired that the reductions be issued on a pro-rata basis because, among other reasons, the legal claims they were relinquishing for past overpayments were substantially larger than those of the average residential ratepayers. Large ratepayers, in so far as they may have been subject to any fraudulently obtained rate increases of LILCO, were likely to obtain greater damages in the underlying suit.

The plaintiff class and LILCO adopted a particular payment basis after hard-fought negotiations at arms length. That basis was accepted by the class as a whole in the fairness hearings and by the trial and appellate courts after extensive review.

The task now is not to rewrite the original agreement in a way that satisfies the present interests of LILCO's successor obligor, LIPA, or of its guarantor, MarketSpan, or even of some members of the plaintiff class. It is, rather, to ensure that the essential terms agreed upon by the parties at the time of the settlement, in so far as practicable, are honored and respected by the present parties.

A party requesting a modification bears a heavy burden of establishing the equitable need for relief. The arguments made in support of this petition for modification fall so far short of that burden that they can be dealt with summarily.

The applicants' principal claim is that the commercial ratepayers have received rate discounts in the last eight years and therefore are no longer entitled to the benefits of the bargain they originally made with LILCO. LILCO, however, voluntarily offered these rate reductions, which were approved by the PSC, as a means of securing and retaining the business of the commercial ratepayers. There is no reason why commercial ratepayers should now be arbitrarily penalized for LILCO's business decisions.

The applicants do not even contend that commercial or high volume discounts were unavailable prior to the settlement or that they will be unavailable in the future. LIPA is now in a position to rectify whatever inequities may have existed in the past by setting new rates for the future. It has even been freed of supervision by the State Public Service Commission to afford it the largest possible leeway in fixing future electric rates.

## VI. PROTECTION OF FUNDS PAYABLE

A state entity, LIPA, has assumed responsibility for discharging the preexisting contractual and judgment obligations of LILCO. Members of the public who testified in the June 1998 hearings were seriously concerned that LILCO might have succeeded in shifting its judgment obligations to the ratepayers through LIPA.

A huge public tax free bond issue, which the ratepayers will need to eventually repay, funded LIPA's purchase of LILCO and the infusion of billions of bond generated money into MarketSpan and possibly elsewhere.

LIPA entered into a contractual relationship with MarketSpan, under which Market-Span has apparently agreed to supply LIPA with the money necessary to satisfy the judgment of the class against LILCO. See Recent Institutional Changes, Part III., supra. Despite this guarantee, the ultimate legal responsibility under the settlement and judgment for making the payments rests with LILCO, which is currently wholly owned by LIPA. As its sole shareholder, LIPA has assumed the responsibility for carrying out LILCO's obligations. That is why LIPA, and not MarketSpan (which contends it holds the money to pay the class action judgment), is currently before the court requesting modification.

Despite the applicants' declarations that the actual funds for the payments are available, the class is entitled to comprehensive and effective assurances that the funds will be provided as needed by MarketSpan, through LIPA, to the ratepayers.

MarketSpan must promptly and publicly certify that it is obligated to advance the full value of any and all amounts that are still owed under the LILCO settlement and that it has placed the necessary funds in a suitable escrow account or deposited them with the clerk of this court in the court's interest bearing account.

## VII. CITIZENS ADVISORY PANEL

Court ordered extension of the powers of CAP beyond the final payment due in the year 2000 has been requested by members of the public. No such court authority exists under the settlement. Creation of an equivalent body may, as a number of speakers at the June 1998 court hearings argued, be desirable, particularly because LIPA's activities are not subject to supervision by the statewide Public Service Commission as were LILCO's. Creation of an oversight body such as CAP to operate after May of 2000 is a matter for the state or local legislative bodies, not this court. CAP may continue until May of 2000, expending whatever money it now has or may obtain from voluntary contributions.

## VIII. CONCLUSION

The petition to modify the settlement order is denied on three separate, alternate grounds. First, the proposed modifications would constitute an unconstitutional taking in violation of the United States Constitution's guarantee of due process under the Fourteenth Amendment and the takings clause of the New York Constitution. Second, the proposed modifications would constitute a violation of the Contract Clause of the United States Constitution. Third, the proposed modification has no equitable basis, is in fact inimical to the rights and expectations of members of the plaintiff class, and violates the Equal Protection Clause of the United States Constitution.

Adequate guarantees to the ratepayers that the necessary funds will be available to make the necessary rebates must be provided by MarketSpan within ten days.

The issue of legal fees due to the class representative for opposing this petition is respectfully referred to the Magistrate Judge.

SO ORDERED.